Elizabeth TROESCHER and
Jude Muoio, Appellees,

v.

Marvin GRODY, M.D., Temple University Hospital, Temple University Health System, Temple OB/GYN Associates, Temple University Center for Pelvic Reconstruction, Urogynecology and Vaginal Surgery, Appellants.

Superior Court of Pennsylvania.

Argued July 29, 2004.
Filed Feb. 24, 2005.

---

**8.** In light of our decision here, we need not    address the other issues raised by Mother.

Lucia B. Morrone, Philadelphia, for appellants.

Slade H. McLaughlin, Philadelphia, for appellees.

BEFORE: LALLY–GREEN, GANTMAN, and TAMILIA, JJ.

OPINION BY LALLY–GREEN, J.:

¶ 1 Appellant health care providers appeal from the order dated January 8, 2004, requiring them to turn over certain documents in discovery. We affirm in part, reverse in part, and remand for further proceedings.

¶ 2 This is a medical malpractice action brought by plaintiffs/appellees Elizabeth Troescher and her husband, Jude Muoio.[1] Troescher claimed that Appellant Dr. Marvin Grody performed a negligent surgery on Troescher and failed to obtain her informed consent. Troescher also alleged corporate negligence on the part of Appellants Temple University Hospital, Temple University Health System, Temple OB/GYN Associates, and Temple University Center for Pelvic Reconstruction, Urogynecology and Vaginal Surgery.

¶ 3 During discovery, Troescher sought Dr. Grody's personnel and credentials file. Appellants moved for a protective order. Appellants claimed that these documents were privileged and immune from discovery under the federal Health Care Quality Improvement Act (HCQIA),[2] and the Pennsylvania Peer Review Protection Act

---

1. For convenience, we will hereafter refer to Troescher in the singular.

2. 42 U.S.C. §§ 11101–11145.

(PRPA).[3] On January 8, 2004, the trial court denied this motion in part. The court ordered Appellants to disclose some of those documents within 10 days.[4] The court denied Appellants' motion for reconsideration on January 23, 2004. This appeal followed.[5]

¶ 4 Appellants raise the following issues on appeal:

1. Whether the lower court erred in finding that the following documents contained in the credentials file of Marvin H.T. Grody, M.D. were discoverable:

   a. Documents created by the National Practitioner Data Bank and deemed confidential by the Health Care Quality Improvement Act, 42 U.S.C.A. § 11137, *et seq.* and 45 C.FR. 60.13; and

   b. Documents deemed confidential by the Pennsylvania Peer Review Protection Act, 63 P.S. § 425.1, *et seq.*

Appellants' Brief at 3.[6]

¶ 5 Preliminarily, we must address Troescher's motion to quash. Specifically, we must determine whether the trial court's order is a collateral order under Pa.R.A.P. 313(b).

■ ¶ 6 Collateral orders are appealable as of right. Pa.R.A.P. 313(a); *J.S. v. Whetzel,* 860 A.2d 1112, 1116 (Pa.Super.2004). Rule 313(b) defines a collateral order as "an order separable from and collateral to the main cause of action

where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost." *Id.* To satisfy the doctrine, all three factors must be present. *Id.* at 1117.

■ ¶ 7 In the instant case, it is possible to analyze Appellants' claims of privilege without analyzing the underlying causes of action for malpractice and corporate negligence. This is true even though the documents at issue could shed light on the underlying negligence actions. *Ben v. Schwartz,* 556 Pa. 475, 729 A.2d 547, 551–552 (1999) (Bureau of Professional and Occupational Affairs' claims of privilege with respect to its investigative file were analytically separate from the underlying claim of dental malpractice). Thus, the order meets the first prong of the test. *Id.; see also, Hoffman v. Knight,* 823 A.2d 202, 206 (Pa.Super.2003) (deliberative process privilege is separable from underlying cause of action for legal malpractice and breach of contract).

¶ 8 We now turn to the "importance" prong. Our Supreme Court has explained that this prong is satisfied "if the interests that would potentially go unprotected without immediate appellate review of that issue are significant relative to the efficiency interests sought to be advanced by adherence to the final judgment rule." *Ben,* 729 A.2d at 552. In *Ben,* the Bureau of Professional and Occupational Affairs claimed

---

3. 63 P.S. §§ 425.1—425.4.

4. The trial court specifically stated that documents 2–10, 24–30, 38–51, 53–63, and 65–71 were discoverable and that all other documents were not discoverable. By order dated August 30, 2004, this Court stayed that part of the Order directing Appellants to turn over certain documents within 10 days.

5. The trial court did not order Appellants to file a Concise Statement of Matters Complained of on Appeal under Pa.R.A.P. 1925. The court did issue a Rule 1925 opinion, reasoning that the appeal should be quashed.

6. Because Appellants did not raise the attorney-client privilege or the work-product doctrine in their brief, we will not discuss these issues.

that executive and statutory privileges were necessary to ensure the effective enforcement of state licensing laws. Specifically, the Bureau argued that without these protections in place, witnesses would be reluctant to disclose information out of fear that it could be divulged in a separate lawsuit. *Id.* Our Supreme Court held that these claims of privilege were rooted in public policy, and were sufficiently important to justify immediate appellate review. *Id.; see also, J.S.,* 860 A.2d at 1117 (privacy interest in personal income information is sufficiently important); *Hoffman,* 823 A.2d at 207 (deliberative process privilege is sufficiently important).

■ ¶ 9 In the instant case, Appellants assert that the documents at issue are confidential and protected from disclosure under federal and state law. The public policy implications of this claim are clear. "The HCQIA was created by the United States Congress in order to improve the quality of medical care by encouraging physicians to identify and discipline other physicians who are incompetent or who engage in unprofessional behavior." *Manzetti v. Mercy Hosp. of Pittsburgh,* 565 Pa. 471, 776 A.2d 938, 945 (2001) (citation omitted). This delicate but necessary process may involve analyzing sensitive and personal information about physicians. In order to encourage candor, and to protect individuals and organizations involved in

this process, Congress declared that certain information used in this process shall remain confidential. 42 U.S.C. § 11137(b).

¶ 10 The Pennsylvania Legislature built a similar protection into the PRPA. 63 P.S. § 425.4; *Young v. Western Pa. Hosp.,* 722 A.2d 153, 156 (Pa.Super.1998) ("the need for confidentiality in the peer review process stems from the need for comprehensive, honest, and sometimes critical evaluations of medical providers by their peers in the profession."). We conclude that these claims of confidentiality are rooted in public policy and are sufficiently important to justify immediate appellate review. *Ben; J.S.; Hoffman.*

¶ 11 Finally, we turn to the "irreparable loss" prong. Our Supreme Court has held that "there is no effective means of reviewing after a final judgment an order requiring the production of putatively protected material." *Ben,* 729 A.2d at 552 (citation omitted). Here, since the material sought is of a confidential nature, "irreparable loss" is demonstrated as there is no effective means of reviewing after final judgment an order requiring the production of this allegedly protected material.

¶ 12 For these reasons, we conclude that the January 8, 2004 order is collateral and appealable as of right under Pa.R.A.P. 313.[7] We therefore deny Troescher's motion to quash. We turn now to the merits

---

**7.** We note that Appellants' case is distinguishable from this Court's recently announced decision in *Jacksonian v. Temple Univ. Health Sys. Found.,* 2004 PA Super 450, 862 A.2d 1275. In *Jacksonian,* this Court held that the discovery order appealed from was not an appealable collateral order. There, the trial court's discovery order required disclosure of interrogatories asking only whether the defendants had requested information from the Data Bank. In other words, the defendants were required to disclose whether they had complied with 45 C.F.R. § 60.11(a) by seeking information from the Data Bank. If they

had not, the provisions of 45 C.F.R. § 60.11(a)(5) could be triggered. Since the defendant hospital's compliance with the trial court's discovery order did not require it to divulge any documents it had received from the Data Bank in response to its inquiry, the fact of the request of the Data Bank was not subject to a privilege. Thus, the discovery order was not an appealable collateral order. Unlike the *Jacksonian* case, here, the discovery order requires Appellants to produce documents for which they have asserted claims of privilege.

of whether the requested documents are discoverable.[8]

■ ¶ 13 Because this issue is one of statutory interpretation, we must determine whether the trial court committed an error of law. *Zane v. Friends Hosp.*, 575 Pa. 236, 836 A.2d 25, 30 n. 8 (2003). Our standard of review is *de novo*. *Id.* When interpreting statutes, our goal is to effectuate the intention of the legislature. *Id.* at 30. We do so primarily by looking to the plain language of the statute. *Id.* If the language of the statute is clear and unambiguous, we will not disregard it under the pretext of pursuing its spirit. *Id.*

■ ¶ 14 First, Appellants argue that certain documents in their files were created by the National Practitioner Data Bank ("Data Bank"). Appellants argue that this information is immune from discovery under Data Bank regulations, and under the federal statute which created the Data Bank.

¶ 15 We will begin with a general background discussion. In 1986, the HCQIA authorized the Department of Health and Human Services to create a national repository for information which is used in the peer review process. 42 U.S.C. § 11134(b). In response, the Department of Health and Human Services created the Data Bank. The Data Bank is governed by federal regulations, set forth at 45 C.F.R. § 60.1 *et seq.*

¶ 16 The Data Bank collects data on physicians from a variety of sources. This data includes sensitive information such as: (1) whether an insurance company has made payments to satisfy a medical malpractice claim against a physician; (2)

whether a state board has revoked or suspended a physician's license based on unprofessional conduct; and (3) whether a hospital has revoked or suspended a physician's clinical privileges. 45 C.F.R. §§ 60.7–60.9.

¶ 17 A hospital must access Data Bank information whenever a physician applies for privileges at that hospital. 45 C.F.R. § 60.10(a)(1). Moreover, a hospital must access this information every two years after granting such privileges. 45 C.F.R. § 60.10(a)(2). If a hospital fails to access the Data Bank, it is presumed to have knowledge of the information therein. 45 C.F.R. § 60.10(b).

¶ 18 The Data Bank regulations contain a confidentiality clause, as follows:

**§ 60.13 Confidentiality of National Practitioner Data Bank information.**

**(a) Limitations on disclosure.** Information reported to the Data Bank is considered confidential and shall not be disclosed outside the Department of Health and Human Services, except as specified in § 60.10,[9] § 60.11[10] and § 60.14.[11] Persons and entities which receive information from the Data Bank either directly or from another party must use it solely with respect to the purpose for which it was provided. Nothing in this paragraph shall prevent the disclosure of information by a party which is authorized under applicable State law to make such disclosures.

**(b) Penalty for violations.** Any person who violates paragraph (a) shall be subject to a civil money penalty of up to $10,000 for each violation. This penalty

**8.** As noted above, we do so without the benefit of a trial court opinion on the merits.

**9.** Information which hospitals must request from the Data Bank.

**10.** Requesting information from the Data Bank.

**11.** How to dispute the accuracy of Data Bank information.

will be imposed pursuant to procedures at 42 C.F.R. part 1003.

45 C.F.R. § 60.13.

¶ 19 Similarly, Section 11137(b) of the HCQIA provides as follows:

**(b) Confidentiality of information.**

(1) **In general.** Information reported under this [subchapter] is considered confidential and shall not be disclosed (other than to the physician or practitioner involved) except with respect to professional review activity. . . . Nothing in this subsection shall prevent the disclosure of such information by a party which is otherwise authorized, under applicable State law, to make such disclosure. . . .

(2) **Penalty for violations.** Any person who violates paragraph (1) shall be subject to a civil money penalty or not more than $10,000 for each violation involved. . . .

42 U.S.C. § 11137(b)(1), (2).

¶ 20 Based on a plain reading of these rules, we conclude that documents generated by the Data Bank which are now in Appellants' possession are confidential and immune from discovery. Under federal law, Appellants must use Data Bank information solely for purposes of peer review.

¶ 21 These confidentiality provisions do not apply to parties which are "otherwise authorized under applicable State law" to disclose this information. 42 U.S.C. § 11137(b)(1); 45 C.F.R. § 60.13. Troescher argues that state law authorizes Appellants to disclose this information. Specifically, Troescher cites the general discovery rules found in the Pennsylvania Rules of Civil Procedure. *See,* Pa.R.C.P. 4001 *et seq.*

¶ 22 We disagree. Pennsylvania's discovery rules specifically **prohibit** disclosure of privileged material. Pa.R.C.P. 4003.1(a) (". . . a party may obtain discovery regarding any matter, **not privileged**, which is relevant to the subject matter involved in the pending action. . . ."). As noted above, the Data Bank information is privileged. Because state law does not authorize Appellants to disclose Data Bank information, we conclude that these documents are immune from discovery. Appellants' first claim has merit.[12]

■ ¶ 23 Next, Appellants claim that the trial court erred when it ordered Appellants to disclose certain documents contained in Dr. Grody's credentials file. Appellants argue that the PRPA protects these documents because they were "generated by either the Office of Counsel for Temple University Health System or the medical staff at Temple University Hospital to be used by the hospital's Credentials Committee, Medical Staff Executive Committee and Board of Governors for the medical staff credentialing of Dr. Grody." Appellants' Brief at 13–14.[13]

■ ¶ 24 Initially, we note that the PRPA "was promulgated to serve the legitimate purpose of maintaining high pro-

---

**12.** The parties disagree about whether Appellants would be subject to the $10,000 civil penalty if they disclosed Data Bank information. We need not address this question directly, because our conclusion remains the same with or without the penalty provisions.

Appellants have also raised the issue of whether 45 C.F.R. § 60.11(a)(5) applies. Section 60.11(a)(5) allows the **Data Bank** to disclose information directly to an attorney who has filed a medical malpractice action against a hospital, but only if that attorney submits evidence that the hospital failed to request information from the Data Bank. In the instant case, Troescher seeks information from Appellants, not from the Data Bank itself. Thus, § 60.11(a)(5) is inapplicable.

**13.** Troescher does not dispute Appellants' description of these documents. She does argue that they are not privileged.

fessional standards in the medical practice for the protection of patients and the general public." *Cooper v. Delaware Valley Medical Ctr.,* 428 Pa.Super. 1, 630 A.2d 1, 7 (1993), *affirmed,* 539 Pa. 620, 654 A.2d 547 (1995). Moreover, the PRPA "represents a determination by the Legislature that, because of the expertise and level of skill required in the practice of medicine, the medical profession itself is in the best position to police its own activities." *Id.*

¶ 25 To this end the PRPA contains a confidentiality provision, as follows:

**Confidentiality of review organization's records.**

The proceedings and records of a review committee shall be held in confidence and shall not be subject to discovery or introduction into evidence in any civil action against a professional health care provider arising out of the matters which are the subject of evaluation and review by such committee and no person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such civil action as to any evidence or other matters produced or presented during the proceedings of such committee or as to any findings, recommendations, evaluations, opinions or other actions of such committee or any members thereof: Provided, however, That information, documents or records otherwise available from original sources are not to be construed as immune from discovery or use in any such civil action merely because they were presented during proceedings of such committee, nor should any person who testifies before such committee or who is a member of such committee be prevented from testifying as to matters within his knowledge, but the said witness cannot be asked about his testimony before such a committee or opin-

ions formed by him as a result of said committee hearings.

63 P.S. § 425.4. In order to maintain the confidentiality of peer review proceedings, courts have adopted a "relatively strict interpretation of the [A]ct." *Young,* 722 A.2d at 156. Based on the plain language of the PRPA, we agree with Appellants that the credentialing documents described above are immune from discovery under § 425.4. *Sanderson v. Frank S. Bryan, M.D., Ltd.,* 361 Pa.Super. 491, 522 A.2d 1138, 1142–1143 (1987), *appeal denied,* 517 Pa. 624, 538 A.2d 877 (1988); *see also, Hayes v. Mercy Health Corp.,* 559 Pa. 21, 739 A.2d 114, 117 (1999).

¶ 26 Troescher's arguments to the contrary are unavailing. First, Troescher argues that some of the credentialing documents [14] are discoverable because the authors sent a **copy** to the peer review committee, but kept the **original** for themselves. According to Troescher, this scenario triggers the proviso in § 425.4, which reads: "information, documents or records otherwise available from original sources are not to be construed as immune from discovery or use in any such civil action merely because they were presented during proceedings of such committee[.]"

¶ 27 We disagree with Troescher's interpretation of this proviso. In our view, the proviso is designed to protect against abuse of the privilege. First, it prevents third parties from claiming immunity for a given document based solely on the fact that the third party happened to submit that document to a peer review committee. In a similar vein, the proviso prevents parties from funneling irrelevant documents through a peer review committee, and then claiming immunity because those documents were at one point the records

**14.** Documents 24–30, 38–44, 46, 53–54, 56– 63, and 65–66.

of a peer review committee. The proviso does not turn on whether a document itself is technically the "original" or merely a "copy." Rather, it turns on whether the documents are available from an "original source," other than the review organization itself.[15] To the extent that the court relied on Troescher's distinction between original documents and copies, we hold that the court committed an error of law.

¶ 28 Next, Troescher argues that "while the [PRPA] shields the 'records of a **review committee**,' it does not shield documents generated by **individuals.**" Troescher's Brief at 12 (emphasis in original). Troescher relies on the text of § 425.4, which arguably extends confidentiality only to the records of a "review **committee.**"

¶ 29 Again, we disagree. The PRPA does not define the term "review committee." The PRPA does define the term "review **organization,**" as follows:

> any committee engaging in peer review, including a hospital utilization review committee, a hospital tissue committee, a health insurance review committee, a hospital plan corporation review committee, a professional health service plan review committee, a dental review committee, a physicians' advisory committee, a veterinary review committee, a nursing advisory committee, any committee established pursuant to the medical assistance program, and any committee established by one or more State or local professional societies, to gather and review information relating to the care and treatment of patients for the purposes of (i) evaluating and improving the quality

of health rendered; (ii) reducing morbidity or mortality; or (iii) establishing and enforcing guidelines designed to keep within reasonable bounds the cost of health care. **It shall also mean any hospital board, committee or individual reviewing the professional qualifications or activities of its medical staff or applicants for admission thereto.** It shall also mean a committee of an association of professional health care providers reviewing the operation of hospitals, nursing homes, convalescent homes, or other health care facilities.

63 P.S. § 425.2, **Definitions** (emphasis added). Thus, for our purposes, a "review organization" is an entity or an individual engaged in peer review. The heading of § 425.4, "Confidentiality of **review organization's** records," demonstrates the Legislature's clear intent to extend confidentiality to the records of a "review organization." Again, such an "organization" is defined in relevant part as either a committee or an individual.

¶ 30 Thus, for all practical purposes, the Legislature uses the terms "committee" and "individual" interchangeably. In our view, drawing a distinction between multi-person committees and single individuals would be a distracting and meaningless exercise. It would also subvert the plain and overriding intent of the Legislature to protect peer review records. To the extent that the trial court relied on Troescher's flawed argument to the contrary, we are again constrained to conclude that the court committed an error of law.

---

**15.** This Court has cautioned against vague, undefined, and open-ended "fishing expeditions" for original source materials. *Young,* 722 A.2d at 156–157. We further noted that "[i]n order to argue that the documents requested are 'original documents,' a party must establish this fact before the court. If a party is unsure, then an *in camera* review of documents might be considered." *Id.* at 157. On remand, the parties and the trial court should take heed of these instructions.

¶ 31 We affirm in part, reverse in part the trial court's order, and remand for further proceedings consistent with this Opinion.

¶ 32 Order affirmed in part, reversed in part, and case remanded. Jurisdiction relinquished.

¶ 33 TAMILIA, J.: files a Concurring and Dissenting Opinion.

## CONCURRING AND DISSENTING OPINION BY TAMILIA, J.:

¶ 1 While I agree with the majority's determination that the Order subject of our consideration is collateral and appealable as of right under Pa.R.A.P. 313, **Collateral Orders (b) Definition**, I respectfully dissent from the majority's decision in so far as it reverses the trial court Order and finds numerous documents in this medical malpractice action to be privileged and immune from discovery.

¶ 2 Appellants argue documents two through ten, prepared by the National Practitioner Data Bank (NPDB) in response to their request for inclusion in Dr. Grody's credentials file, and deemed discoverable by the January 8, 2004 Order, are confidential and immune from discovery under the Health Care Quality Improvement Act (HCQIA), 42 U.S.C.A. §§ 11137, *et. seq*, and Confidentiality of National Practitioner Data Bank Information, 45 C.F.R. 60.13.[16] Appellants also argue that other requested documents, nos. 11–40 and 43–71, including, among other correspondence, appraisals, recommendations, and reference letters, were prepared by the general counsel and staff members of Temple University Hospital for the use of hospital credential committees, and are privileged and immune from discovery under the Pennsylvania Peer Review Protection Act (PPRPA), 63 P.S. § 425.1, *et. seq.*

¶ 3 Appellees reply that the HCQIA does not prevent disclosure of information possessed by the NPDB by a party to litigation who, under state law, is authorized to disclose such information, as are the appellants/hospitals. Appellees add that appellants' efforts to prevent disclosure are premised on "snippets" of the applicable law taken out of context and/or not fully set forth.

¶ 4 Appellants also argue that Section 11137, **Miscellaneous provisions, (b) Confidentiality of information,** of the HCQIA prohibits and subjects to penalty, for the purpose of this litigation, the disclosure of the information contained in the NPDB.[17] In arguing the information contained in the NPDB may not be disclosed for this litigation subject to monetary penalty, I believe appellants ignore the plain language of the regulation addressing the issue of confidentiality which states, "[n]othing in this paragraph shall prevent the disclosure of information by a party which is authorized under applicable State law to make such disclosure." 45 CFR § 60.13(a). This limitation is repeated in the confidentiality subsection of HCQIA; "[n]othing in this subsection shall prevent the disclosure of such information by a party which is otherwise authorized, under applicable State law, to make such disclo-

---

16. Pursuant to the federal Health Care Quality Improvement Act of 1986, a hospital is required to supply information concerning a doctor's suspension to a national data bank, and any hospital at which the doctor may seek employment or clinical privileges in the future will be required to review the information contained in the data bank.

17. Because the relevant sections of the National Practitioner Data Bank regulations, Pennsylvania Peer Review Protection Act and other applicable statutes have been included in the majority Opinion, I do not quote them in their entirety.

sure." 42 USCA § 11137(b). The entitled parties include those individuals, such as appellees, who have instituted lawsuits against said health care provider. Further, as appellees assert, the Pennsylvania Rules of Civil Procedure authorize and/or require the appellants to release the information requested.

¶ 5 I find equally unpersuasive appellants' argument they are estopped by the Pennsylvania Peer Review Protection Act (PPRPA), 42 P.S. §§ 425.1, *et. seq,* from releasing the requested information concerning Dr. Grody. Appellants argue documents numbers 24–30, 38–51, 53–63, and 65–71, all ordered discoverable, were prepared by the hospital counsel and staff as part of their credentials review process, and therefore are protected by § 425.4, **Confidentiality of review organization's records,** of the PPRPA.

¶ 6 With the exception of documents nos. 45, 47–52 and 64 contained in the privilege log of appellants' amended motion for a protective Order, the originals of all documents are not in the hands of the appellants, and the location of them is either unknown or lies elsewhere. On that basis, I would find the documents are not protected from discovery under the PPRPA.

¶ 7 The originals of the remaining documents, numbers 45, 47–52 and 64, are possessed by the Temple University Health System's credentials, performance improvement, and medical staff executive committees, and were created, as were all others, for the purpose of medical staff credentialing. In a 1996 medical malpractice action, *Short v. Pavlides,* 33 D. & C. 4th 118 (1996), the trial court denied the defendant/doctor's motion for a protective Order to prevent discovery of a resident's evaluation file and the doctor's credentials file, reasoning, *inter alia,* (1) that the documents sought appeared to be available from an original source, thereby not sub-

ject to confidentiality under § 425.2 of the PPRPA, and (2) the resident's evaluation file was discoverable if the complaint included an allegation of negligent hiring or supervision.

¶ 8 The PPRPA defines a "review organization", an entity whose proceedings and records are protected from discovery under the PPRPA, as "any committee engaging in peer review, including a hospital utilization review committee, a hospital tissue committee, a health insurance review committee.... It shall also mean any hospital board, committee or *individual* reviewing the professional qualifications or activities of its medical staff or applicants for admission thereto...." 63 P.S. § 425.2, **Definitions** (emphasis added). The *Short* Court explained,

> even though *"individuals reviewing professional qualifications or activities of a medical staff or applicants thereto"* are included in the definition of a review organization, individuals have not been defined as a review committee, and are not entitled to confidentiality under section 425.4. Since section 425.4 confers confidentiality on review committees' records and proceedings including testimony before a review committee, but does not grant that privilege to review organizations, that confidentiality does not pertain to individuals, even if they are a peer review organization.
>
> However, those persons or other entities identified as review organizations, which are not peer review committees, are granted immunity from liability under most circumstances by section 425.3 of the Act.
>
> Apparently by distinguishing a peer review committee from peer review organizations (which includes individual evaluators), the legislature intended to offer different benefits to a review organization, i.e., immunity from legal pro-

cess, while offering the peer review committee both immunity and confidentiality in an attempt to strike a fair balance and allow peer review committee studies to solve medical procedure problems and insure better practice while still allowing discovery of material, which we have here, which might be damaging to individual defendants, but still allow a frank and candid discussion from individual evaluators by granting immunity form legal process.

*Short, supra,* at 124–125 (emphasis added). Accordingly, on this basis even those final documents prepared by *individuals* and included in appellants' privilege log are not immune from discovery. Public policy, *Short* concludes, does not support a policy that would allow individuals or boards that "have derogatory information, which may lead to the discovery of admissible evidence bearing on the ability of the individual to render competent medical treatment, to disregard or fail to disclose that information, either purposefully or negligently, simply to avoid liability for the inappropriate conduct of that individual alleged to have committed medical malpractice." *Id.* at 125. Such is the case before us.

¶ 9 Appellees allege malpractice by Dr. Grody and negligent supervision of Dr. Grody by the remaining health care defendants, to wit, allowing a sub par surgeon to operate. I do not believe the appellant health care providers should be able to escape liability by wrapping themselves in the cloth of the PPRPA. Moreover, referencing *Thompson v. Nason Hospital,* 527 Pa. 330, 591 A.2d 703 (1991), the *Short* Court further reasoned that to allow a corporate defendant in a medical malpractice lawsuit, accused of negligent supervi-

sion, to avoid producing documents that are not available from another source, "would vitiate the Supreme Court's decision in *Thompson v. Nason Hospital, supra,* and could potentially allow medical providers to avoid producing documents which could show negligent hiring or supervision of medical professions, which . . . would clearly be in violation of public policy [and would] allow people to cover up for incompetent physicians or to allow properly functioning physicians to be maligned with false testimony." *Id.* at 126. I am persuaded by the reasoning of the *Short* court and therefore agree with the trial court's decision herein finding the remaining documents (nos. 45, 47–52 and 64) subject to discovery.

The Pennsylvania Rules of Civil Procedure make clear that privileged material is not subject to discovery: Pa. R.C.P. 4003.1 and Pa.R.C.P. 4009. The burden, however, rests with a party claiming a privilege to show that he or she falls within the ambit of that privilege: *In Re: Estate of Carrol J. Warrell,* No. 21–77–681 (Cumb. Filed Jan. 14, 1982). Furthermore, the final decision as to whether privilege applies under the circumstances lies with the court: *Com. v. Hess,* 270 Pa. Superior Ct. 501, 411 A.2d 830 (1979).

*Grace Evangelical Lutheran Church v. Spiker,* 23 D. & C. 3rd 597, 598 (1982); *see also Taylor v. Pars Manufacturing Co.,* 13 Phila.Co.Rptr. 132, 135, 1985 WL 384557, 1985 Phila. Cty. Rptr. LEXIS 89, \*6 (1985). The trial court herein conducted an in camera review of the documents sought and determined which were immune from discovery. Appellants have not convinced me the trial court erred.[18]

---

**18.** While I acknowledge that the decisions of the courts in *Short v. Pavlides,* 33 D. & C. 4th 118 (1996), *Grace Evangelical Lutheran*

*Church v. Spiker,* 23 D. & C. 3rd 597 (1982) and *Taylor v. Pars Manufacturing Co.,* 13 Phila.Co.Rptr. 132, 1985 WL 384557 (1985), are

¶ 10 I would affirm the trial court's Order in its entirety.

not binding on this Court, I find the legal reasoning contained therein to be persuasive and am constrained to cite those cases given the dearth of law on the issue under consideration.