David PIROLI, Administrator
of the Estate of Cathy Piroli,
DECEASED, Appellee,

v.

Mark R. LODICO, M.D., Advanced Pain Medicine, P.C. and Valley Medical Facilities, Inc. t/b/a Sewickley Valley Hospital.

Appeal of Three Rivers Endoscopy Center, Appellant.

David Piroli, Administrator of
the Estate of Cathy Piroli,
Deceased, Appellee,

v.

Mark R. Lodico, M.D., Advanced Pain Medicine, P.C. and Heritage Valley Health System, Inc. t/b/d/a Sewickley Valley Hospital.

Appeal of Mark R. Lodico, M.D. and Advanced Pain Medicine, P.C.

Superior Court of Pennsylvania.

Argued Aug. 29, 2006.
Filed Oct. 12, 2006.

John W. Jordan, IV, Pittsburgh, for Three Rivers Endoscopy, appellant.

Lauren Ames, Pittsburgh, for Lodico and Advanced Pain Medicine, appellant.

David M. Landay, Pittsburgh, for Piroli, appellee.

BEFORE: HUDOCK, BENDER and TAMILIA, JJ.

OPINION BY BENDER, J.:

¶ 1 Three Rivers Endoscopy Center ("TRE") appeals from the September 20, 2005 order dismissing its objection to a subpoena that was served upon it during discovery by the plaintiff, David Piroli, administrator of the estate of Cathy Piroli, in an underlying wrongful death and survival action. TRE objected to the subpoena, claiming that certain materials related to its review of the incident underlying the wrongful death and survival case constituted peer review materials that were protected from discovery under the Peer Review Protection Act ("PRPA"), 63 P.S. §§ 425.1–425.4. The trial court concluded that the PRPA did not protect these materials from discovery because a billing manager, who is not considered a "professional health care provider" according to the definition of that term in the PRPA, was present during the review process. We reverse the order dismissing TRE's objection to the subpoena and remand this case.

¶ 2 This case was initiated on July 18, 2002, by plaintiff Piroli, who named, as defendants, Mark R. LoDico, M.D. ("Dr.LoDico"), his practice, Advanced Pain Medicine, P.C. ("Advanced") (collectively, with Dr. LoDico, "LoDico/Advanced"), and Heritage Valley Health System, Inc. t/d/b/a Sewickley Valley Hospital. In his complaint, Piroli alleged that, on September 17, 2001, Dr. LoDico performed a transforaminal epidural steroid injection (a type of nerve block), at the C–7 level, on his wife, Cathy Piroli. Complaint, 9/17/01, at ¶ 13. The procedure took place at TRE's ambulatory care facility, where Dr. LoDico was credentialed to perform such procedures; however, TRE was not named as a defendant in this case. During the procedure, it was alleged that Dr. LoDico punctured Cathy Piroli's left vertebral artery and, during the injection of a steroid and anesthetic solution, Cathy Piroli became unresponsive. Id. at ¶¶ 14–15. An ambulance transported her to Sewickley Valley Hospital. Id. at ¶¶ 15–16. Later that evening, Cathy Piroli was transferred to Allegheny General Hospital. Id. at ¶ 25. Cathy Piroli died the following day, September 18, 2001. Id. at ¶ 29.

¶ 3 On January 28, 2003, during the course of discovery, Piroli filed a notice of his intention to serve a subpoena, pursuant to Pa.R.C.P. 4009.21, on TRE. In the subpoena, Piroli requested the following documents:

> With regard to Mark R. LoDico, M.D., and his patient, Cathy Piroli, ... a complete copy of any documents in your possession concerning your investigation of the quality of care for Mrs. Piroli's treatment on September 17, 2001, including but not limited to letters, medical reports, medical records, photographs, films, expert reports, consultation reports, memorandum, summaries, audiotapes, videotapes and any other tangible things.

Subpoena to Produce Documents· or Things for Discovery Pursuant to Rule 4009.22, 1/28/03.

¶ 4 On February 12, 2003, LoDico/Advanced filed an objection to the subpoena Piroli sought to serve on TRE, claiming that the requested material was not discoverable under the PRPA. Nevertheless, on July 5, 2005, the court overruled the objection and permitted the subpoena to be served on TRE. On July 27, 2005, TRE filed objections to the subpoena. TRE also argued that materials sought under the subpoena that related to TRE's peer review of Dr. LoDico's care of Cathy Piroli were protected from discovery pursuant to the PRPA.

¶ 5 In September of 2005, Piroli filed a motion to determine the sufficiency of the objections. In this motion, Piroli asserted that his counsel had deposed Glenn M. Daugherty, TRE's Executive Director, and had concluded that the proceedings undertaken by TRE to review the care given by Dr. LoDico did not constitute "peer review" because Mr. Daugherty stated that he and a billing manager, both of whom are not professional healthcare providers, were present at the proceedings.

¶ 6 The trial court entered the following order on September 20, 2005:

[I]t appearing that peer review involves the evaluation by health care providers of the quality or services performed by other health care providers and thus a peer review committee may not include persons who are not health care providers, it is hereby ORDERED, ADJUDGED, AND DECREED that [TRE's] Objections to the Subpoena directed to it are overruled, and [TRE] shall produce the documents which are

the subject of the Subpoena pursuant to Rule 4009.22.

Order, 9/20/05. Both TRE and LoDico/Advanced filed timely notices of appeal from this order.[1]

■ ¶ 7 First, we will address TRE's appeal, docketed at No. 1695 WDA 2005. TRE presents the following sole issue for our review: "Does the presence on a health care facility's peer review committee of individuals who are not health care providers make the protections of the Peer Review Protection Act inapplicable to its records?" TRE's brief at 4. In addressing this issue, we must interpret the PRPA. Therefore, we are guided by the following:

Because this issue is one of statutory interpretation, we must determine whether the trial court committed an error of law. Our standard of review is *de novo*. When interpreting statutes, our goal is to effectuate the intention of the legislature. We do so primarily by looking to the plain language of the statute. If the language of the statute is clear and unambiguous, we will not disregard it under the pretext of pursuing its spirit.

*Dodson*, 872 A.2d at 1241 (citations omitted).

¶ 8 The PRPA protects the confidentiality of peer review materials according to the following provision:

The proceedings and records of a review committee shall be held in confidence and shall not be subject to discovery or introduction into evidence in any civil action against a professional health care provider arising out of the matters which are the subject of evaluation and review by such committee and no person who was in attendance at a meeting of

---

**1.** We note that this appeal has been taken properly under Pa.R.A.P. 313(b), as an appeal from a collateral order. *See Dodson v. Deleo*, 872 A.2d 1237, 1240–41 (Pa.Super.2005).

such committee shall be permitted or required to testify in any such civil action as to any evidence or other matters produced or presented during the proceedings of such committee or as to any findings, recommendations, evaluations, opinions or other actions of such committee or any members thereof: Provided, however, That information, documents or records otherwise available from original sources are not to be construed as immune from discovery or use in any such civil action merely because they were presented during proceedings of such committee, nor should any person who testifies before such committee or who is a member of such committee be prevented from testifying as to matters within his knowledge, but the said witness cannot be asked about his testimony before such a committee or opinions formed by him as a result of said committee hearings.

63 P.S. § 425.4. This provision contains several terms-of-art that are defined specifically in the PRPA. First, a "review organization" is defined as:

> any committee engaging in peer review, including a hospital utilization review committee, a hospital tissue committee, a health insurance review committee, a hospital plan corporation review committee, a professional health service plan review committee, a dental review committee, a physicians' advisory committee, a veterinary review committee, a nursing advisory committee, any committee established pursuant to the medical assistance program, and any committee established by one or more State or local professional societies, to gather and review information relating to the care and treatment of patients for the purposes of (i) evaluating and improving the quality of health care rendered; (ii) reducing morbidity or mortality; or (iii) establishing and enforcing guidelines designed to keep within reasonable bounds the cost of health care. It shall also mean any hospital board, committee or individual reviewing the professional qualifications or activities of its medical staff or applicants for admission thereto. It shall also mean a committee of an association of professional health care providers reviewing the operation of hospitals, nursing homes, convalescent homes or other health care facilities.

63 P.S. § 425.2 (emphasis added). We have said that a "review organization" is "an entity or an individual engaged in peer review." *Troescher v. Grody,* 869 A.2d 1014, 1022 (Pa.Super.2005). The legislature has used the terms "committee" and "individual" interchangeably in this regard. *Id.* Whether a multi-person committee or an individual conducts the review is inconsequential—the "overriding intent of the Legislature" is to "protect peer review records." *Id.*

¶ 9 The PRPA also defines "professional health care provider" in pertinent part as follows:

> (1) individuals or organizations who are approved, licensed or otherwise regulated to practice or operate in the health care field under the laws of the Commonwealth, including, but not limited to, the following individuals or organizations:
>
> (i) a physician;
>
> (ii) a dentist;
>
> (iii) a podiatrist;
>
> (iv) a chiropractor;
>
> (v) an optometrist;
>
> (vi) a psychologist;
>
> (vii) a pharmacist;
>
> (viii) a registered or practical nurse;
>
> (ix) a physical therapist;

(x) an administrator of a hospital, nursing or convalescent home or other health care facility; or

(xi) a corporation or other organization operating a hospital, nursing or convalescent home or other health care facility;....

63 P.S. § 425.2. Finally, the definition of "peer review," which was central to the trial court's decision in the instant case, is:

the **procedure for evaluation by professional health care providers of the quality and efficiency of services ordered or performed by other professional health care providers**, including practice analysis, inpatient hospital and extended care facility utilization review, medical audit, **ambulatory care review**, claims review, and the compliance of a hospital, nursing home or convalescent home or other health care facility operated by a professional health care provider with the standards set by an association of health care providers and with applicable laws, rules and regulations.

*Id.* (emphasis added). Essentially, the trial court concluded that, because TRE's billing manager was not a professional health care provider and because she was present during the peer review activity conducted by TRE, TRE could not claim the protections of the PRPA. We conclude initially that the trial court's decision conflicts with the legislative intent underlying the statute.

■■■ ¶ 10 "[T]he PRPA was promulgated to serve the legitimate purpose of maintaining high professional standards in the medical practice for the protection of patients and the general public." *Troescher,* 869 A.2d at 1020–21 (citation and quotation marks omitted). Moreover:

The [PRPA] represents a determination by the legislature that, because of the expertise and level of skill required in the practice of medicine, the medical

profession itself is in the best position to police its own activities.... [T]he need for confidentiality in the peer review process stems from the need for comprehensive, honest, and sometimes critical evaluations of medical providers by their peers in the profession. Without the protection afforded through the confidentiality of the proceedings, the ability of the profession to police itself effectively would be severely compromised.

*Young v. Western Pennsylvania Hosp.,* 722 A.2d 153, 156 (Pa.Super.1998) (citations and quotation marks omitted) (holding that "documents used in the determination of staff privileges are exactly the type of documents the legislature contemplated when drafting the [PRPA,]" and that "[g]ranting, limiting, or revoking staff privileges is one of the strongest tools the medical profession uses to police itself").

¶ 11 In overruling TRE's objection to the subpoena, the trial court relied primarily on the definition of peer review indicated above, *i.e.,* the "procedure for evaluation by professional health care providers of the quality and efficiency of services ordered or performed by other professional health care providers[.]" *See* 63 P.S. § 425.2. Since a billing manager is not included in the definition of "professional health care provider," the trial court concluded that the mere presence of the billing manager at TRE's review proceedings removed these proceedings from the protections of the PRPA. However, Mr. Daugherty's description of TRE's review proceedings reveals that they were the type of proceedings that the legislature intended would be protected by the PRPA.

¶ 12 In his deposition, TRE's Executive Director, Mr. Daugherty, stated that TRE is a licensed ambulatory surgery center. Deposition of Glenn M. Daugherty, 6/25/03, at 8. He stated that Dr. LoDico was not an owner, operator, shareholder or di-

rector of TRE, but was credentialed by TRE's board to perform pain medicine procedures at TRE's ambulatory surgery center. *Id.* at 8–10. Dr. LoDico merely used TRE's facilities, which were near his office at the time, to perform "epidural steroid injections, pain, or joint injections." *Id.* at 11.

¶ 13 Significantly, Piroli's counsel questioned Mr. Daugherty to determine whether the review undertaken by TRE following the incident with Cathy Piroli constituted "peer review" for purposes of the PRPA. *Id.* at 16–17. Mr. Daugherty indicated that, in response to the incident, TRE formed an ad hoc committee under its medical staff bylaws (specifically, Article V, entitled "Corrective Action") to review the care rendered to Cathy Piroli by Dr. LoDico. *Id.* Mr. Daugherty testified that several physicians, nurses, himself as executive director, TRE's secretary, and TRE's billing manager participated in the ad hoc committee. *Id.* at 24.

¶ 14 Additionally, TRE hired a physician specializing in pain medicine for the specific task of reviewing records pertaining to the incident. This specialist issued a report to the ad hoc committee on his findings. *Id.* at 16–18. Indeed, at oral argument before our Court, Piroli's attorney conceded that he was specifically interested in obtaining this report.[2] In any event, Mr. Daugherty testified that the documents generated by the ad hoc committee and the pain medicine specialist's report never left the purview of the review committee. *See id.* at 16–17. In other words, the pain medicine specialist's report was generated for the committee, submitted to the committee, and remained with the committee. *See id.* at 18. Additionally,

the results of the ad hoc committee's review remained only within the committee. *Id.* at 21. Mr. Daugherty agreed that the report of the pain medicine specialist was not disseminated to anyone outside of the committee, including Dr. LoDico. *Id.* at 22. Beside the pain specialist's report, the only other document generated by the ad hoc committee was entitled Emergency CQI (Continuous Quality Improvement) Meeting, dated September 25, 2001. *Id.* at 23.

¶ 15 The above description of the review process undertaken by TRE in response to the incident constituted a "peer review" that the legislature intended would be protected by the PRPA. Once again, as noted above, the PRPA defines peer review as the "procedure for evaluation by professional health care providers of the quality and efficiency of services ordered or performed by other professional health care providers ... including ambulatory care review." Indeed, TRE's ad hoc committee included professional health care providers, including doctors and nurses, who convened to evaluate the quality of care rendered by Dr. LoDico to Cathy Piroli. Thus, the review process that Mr. Daugherty described fits within the statute's definition of peer review. Indeed, the documents generated by the committee, including the pain medicine specialist's report, were used solely by the review committee to evaluate the quality of care rendered by Dr. LoDico. *See, e.g., Dodson,* 872 A.2d at 1243 (protecting documents under the PRPA that were generated exclusively for peer review purposes and were maintained exclusively within the peer review committee files).

2. In this regard, we presume that Piroli has obtained his own expert to conduct a similar assessment with regard to the care rendered by Dr. LoDico, and we also note that the medical records generated by TRE with regard to the care rendered to Cathy Piroli would not be protected under the PRPA and would be available for such expert's review.

¶ 16 The trial court's interpretation of the definition of peer review, *i.e.*, that *only* health care providers could be on the peer review team, also runs counter to the primary objective of statutory interpretation, which is to "ascertain and effectuate the intention of the General Assembly." *McManamon v. Washko,* 2006 PA Super 245, ¶ 52, 906 A.2d 1259 (citation omitted). We have stated:

> In attempting to ascertain the meaning of a statute, we must consider the intent of the legislature and examine the practical consequences of a particular interpretation. We presume the legislature did not intend a result that is absurd and unreasonable. In construing legislative intent, this Court may look to the occasion and necessity of a statute, the circumstances in which it was intended, the mischief to be remedied, the object to be attained by the law, former law on the same subject and the consequences of a particular interpretation.

*Id.* (citation omitted). The description of the process undertaken by TRE to evaluate the quality of care rendered by Dr. LoDico, a physician who was credentialed in TRE's facilities at the time, fell within the definition of peer review. The mere fact that the billing manager was present, in addition to the health care professionals, on the ad hoc committee should not serve to eviscerate the protections that the legislature intended the PRPA to provide.[3]

¶ 17 Thus, we are not persuaded by Piroli's argument that the "billing manager's presence alone, not the nature of his role, in the committee proceedings, is the controlling question" and that "the billing manager's role indicates the scope and purpose of the committee's work went beyond that of a traditional medical review team." Piroli's brief at 8. In other words, Piroli contends that Mr. Daugherty stated that the billing manager was included in the committee because it was contemplated that the committee would consider financial issues thereby taking the proceedings out of the purview of the PRPA. *Id.* We reject this argument based on the language of the PRPA indicating that one of the purposes of a review organization is not only to evaluate and improve the quality of health care, but *also* to establish and enforce "guidelines designed to keep within reasonable bounds the cost of health care." 63 P.S. § 425.2. Thus, the purpose of the PRPA also includes review of the impact on health care costs, which are matters upon which the billing manager could elucidate for the doctors and nurses on the review team, if needed. Stripping TRE of the protections of the PRPA, on the basis that the billing manager was merely present on the committee, contravenes the legislative intent underlying the PRPA.

¶ 18 Finally, as TRE points out, it is a licensed ambulatory care facility that must comply with certain Pennsylvania regulations with regard to quality of care reviews. Indeed, "with active participation of the medical and nursing staff," ambulatory care facilities are required to "conduct an ongoing quality assurance and improvement program designed to objectively and systematically monitor and evaluate the quality and appropriateness of patient

---

3. Additionally, we note that TRE itself may be considered a "professional health care provider," under the definition of that term in the PRPA, as it is "a corporation or other organization operating a ... health care facility." 63 P.S. § 425.2. *Cf. McClellan v. Health Maint. Org.,* 442 Pa.Super. 504, 660 A.2d 97 (1995), *aff'd,* 546 Pa. 463, 686 A.2d 801 (1996) (concluding that an IPA model HMO that did not have any of its own facilities, but merely contracted with physicians to provide health care, was not a "professional health care provider" for purposes of the PRPA).

care, pursue opportunities to improve patient care and resolve identified problems." 28 Pa.Code § 557.1. The program must include "[p]eer-based review of clinical performance of individuals with clinical privileges[,]" *id.* at § 557.2(c)(1)(i), like that which occurred in the instant case. Moreover, section § 557.4(a) dictates who must be on the quality assurance and improvement committee of an ambulatory care facility. Specifically, the committee "shall" consist of, not only health care practitioners, but also a "representative of administration." Indeed, the PRPA includes "ambulatory care review" under the definition of "peer review." Thus, it would be onerous, and unnecessary, to require TRE to conduct essentially the same proceedings, one without the billing manager present and one with the billing manager present, in order to benefit from the PRPA's protections and, at the same time, comply with the regulations governing quality care initiatives for ambulatory care facilities.

¶ 19 For the foregoing reasons, we reverse the order dismissing TRE's objection to the subpoena and remand this case for further proceedings.

¶ 20 Since LoDico/Advanced's appeal at No. 1771 WDA 2005, taken from the same order dismissing TRE's objections to the subpoena, raises essentially the same arguments as those raised by TRE, we reach the same conclusion therein.

¶ 21 Order reversed. Case remanded. Jurisdiction relinquished.