686 A.2d 801

**Ronald McCLELLAN and Harold Shotel, Co–Executors of the Estate of Marilyn M. McClellan, Deceased, Appellees**

v.

**HEALTH MAINTENANCE ORGANIZATION OF PA a/k/a HMO PA Foundation and United States Healthcare OF PA, Inc., d/b/a HMO PA, Appellants.**

Supreme Court of Pennsylvania.

Argued April 29, 1996.

Decided Dec. 12, 1996.

464

Kenwyn M. Dougherty, J. Michael Doyle, Philadelphia, for HMO PA.

Joseph L. Messa, Jr., Thomas W. Sheridan, Brian D. Rosenthal, Philadelphia, for McClellan.

### *ORDER*

PER CURIAM.

The Court being evenly divided, the Order of the Superior Court is hereby affirmed.

NIX, Former C.J., did not participate in the consideration or decision of this case.

FLAHERTY, C.J., concurs in the result.

NEWMAN, J., files an opinion in support of affirmance.

ZAPPALA, J., files an opinion in support of reversal in which CASTILLE, J., joins.

NIGRO, J., files an opinion in support of reversal.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## OPINION IN SUPPORT OF AFFIRMANCE

NEWMAN, Justice.

Appellant Health Maintenance Organization of Pennsylvania, a.k.a. HMO PA Foundation and United States Healthcare of PA, doing business as HMO PA, Inc. (HMO PA), appeals from the June 2, 1995 Order of the Superior Court that reversed and remanded the decision of the Court of Common Pleas of Delaware County (trial court) denying HMO PA's motion to compel the production of records. We affirm the decision of the Superior Court.

## I. Facts and Procedural History

HMO PA administers a health maintenance organization (HMO) under the Individual Practice Association (IPA) structural model pursuant to Chapter 9 of the Pa.Code [1] and the Health Maintenance Organization Act.[2] On February

---

1. 28 Pa.Code § 9.2. defines the three organizational models of HMOs in Pennsylvania. First, an Individual Practice Association (IPA) model HMO, such as HMO PA, is an organized system which combines the delivery and financing of health care and which provides basic health services to voluntarily enrolled subscribers for a fixed prepaid fee. Second, a Staff model HMO is an HMO that delivers services through its own physicians who are paid employees or staff of the HMO. Third, a Group model HMO is an HMO that contracts with a medical group, partnership, or corporation composed of health care professionals licensed to practice medicine or osteopathy as well as other health professionals necessary for the provision of health services.

2. Act of December 29, 1972, P.L. 1701, No. 364, § 1, imd. effective, *as amended,* 40 P.S. § 1551 *et seq.*

13, 1984, decedent Marilyn M. McClellan signed a group en-
rollment application provided by her employer, the School
District of Philadelphia, to enroll in the HMO program ad-
ministered by HMO PA. Under the Group Master Contract
between the School District and HMO PA, decedent's choice
of primary care doctors was restricted to a limited list of
participating physicians selected by HMO PA.

In October 1985, decedent consulted Joseph Hempsey, D.O.,
her primary care doctor chosen under the HMO plan, for
treatment of a mole on her back that she alleged had marked-
ly changed in color and size. After removing the mole in his
office, Dr. Hempsey discarded the excised tissue, failing to
send it to the pathology laboratory for a biopsy, and he also
failed to order further testing. Decedent subsequently devel-
oped metastic malignant melanoma from which she died on
January 1, 1988 at forty-two years of age.

Decedent filed a negligence action against Dr. Hempsey,
alleging that had he sent the removed tissue for a histologic
examination, the malignancy would have been detected and
they could have undertaken one or more procedures to pre-
vent the spread of the disease. Upon decedent's death, Appel-
lees Ronald M. McClellan and Harold Shotel (collectively,
McClellan), co-executors of the decedent's estate, continued to
prosecute her action against Dr. Hempsey. In addition, on
September 25, 1989, McClellan initiated a separate action
against HMO PA asserting, *inter alia,* a claim in corporate
negligence for HMO PA's alleged failure to retain competent
physicians and to screen and review the qualifications of
selected physicians to assure their continued competence.
Specifically, McClellan alleged that: (1) under contracts theo-
ry, HMO PA breached its subscriber agreement by misrepre-
senting the competence of its participating physicians; and (2)
under a theory of ostensible corporate liability, HMO PA's
failure to adequately select, retain, and review Dr. Hempsey's
qualifications amounted to negligence causing decedent's
death. The trial court consolidated McClellan's actions
against HMO PA and the doctor.

Before trial, HMO PA filed Preliminary Objections assert-
ing McClellan's failure to state a cause of action in corporate
negligence under *Thompson v. Nason Hospital*, 527 Pa. 330,
591 A.2d 703 (1991).[3] The trial court granted HMO PA's
preliminary objections and dismissed the complaint. On ap-
peal, however, the Superior Court reversed the trial court's
ruling in *McClellan v. Health Maintenance Organization of
Pennsylvania*, 413 Pa.Super. 128, 604 A.2d 1053, *allocatur
denied*, 532 Pa. 664, 616 A.2d 985 (1992) (*McClellan I* ). In
*McClellan I*, the court held that only two of the four duties
assigned to hospitals by this Court in *Thompson* could apply
to IPA model HMOs, namely the duties to "select and retain
only competent physicians," and the duty to "formulate, adopt
and enforce adequate rules and policies" to ensure quality care
for its subscribers. *McClellan I*, 413 Pa.Super. 128, 139, 604
A.2d 1053, 1059. The *McClellan I* court concluded that the
breach and resulting injuries alleged in McClellan's complaint
were sufficient to state a cause of action. Accordingly, the
Superior Court remanded the case to the trial court for
litigation.

During the course of discovery, McClellan served three
requests for the production of documents related to Dr.
Hempsey's application for admission to HMO PA and later
investigations of his care of patients.[4] HMO PA objected to

**3.** In *Thompson,* we applied the theory of corporate negligence to
hospitals, reasoning that:

the corporate hospital of today has assumed the role of a comprehen-
sive health center, with responsibility for arranging and coordinating
the total health care of its patients. . . . The hospital's duties [owed to
the patient] have been classified into four areas: (1) a duty to use
reasonable care in the maintenance of safe and adequate facilities
and equipment; (2) a duty to select and retain only competent
physicians; (3) a duty to oversee all persons who practice medicine
within its walls as to patient care; and (4) a duty to formulate, adopt
and enforce adequate rules and policies to ensure care for the
patients.

*Thompson,* 527 Pa. at 338–340, 591 A.2d at 706–707 (citations omitted).

**4.** The following Requests for Documents are at issue:

No. 5: Documents regarding Dr. Hempsey's application for associa-
tion with HMO PA;

several of McClellan's document requests, citing the confidentiality provisions of the Peer Review Protection Act (the Act).[5] The Act's confidentiality provision, Section 425.4, protects a "professional health care provider" from compelled disclosure of proceedings and records of a peer review committee during discovery in a civil action.[6]

The trial court agreed with HMO PA that the Act prohibited the documents at issue from compelled disclosure during discovery. However, on McClellan's motion, the trial court certified the issue for appeal to the Superior Court, and the Superior Court granted McClellan's petition for permission to appeal. The Superior Court reversed the trial court decision,

> No. 6: Documents reviewed by any review board regarding Dr. Hempsey's application for association with HMO PA;
> No. 7: Any reports, memos, or letters regarding any investigation of Dr. Hempsey by HMO PA;
> No. 8: Any reports, memos, or letters regarding the care or treatment provided by Dr. Hempsey to patients to participating members of HMO PA; and
> Supplemental request for documents No. 3: Any reports, memos, or letters pertaining to any follow-up inspections of Dr. Hempsey's practice or his office after he became an HMO PA doctor.

5. Act of July 20, 1974, P.L. 564, No. 193, § 1, 63 P.S. § 425.1 *et seq.*

6. Section 425.4 provides:

 **Confidentiality of review organization's records**

 The proceedings and records of a review committee shall be held in confidence and shall not be subject to discovery or introduction into evidence in any civil action against a professional health care provider arising out of matters which are the subject of evaluation and review by such committee and no person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such civil action as to any evidence or other matters produced or presented during the proceedings of such committee or as to any findings, recommendations, evaluations, opinions or other actions of such committee or any members thereof: Provided, however, That information, documents, or records otherwise available from original sources are not to be construed as immune from discovery or use in any such civil action merely because they were presented during proceedings of such committee, nor should any person who testifies before such committee or who is a member of such a committee be prevented from testifying as to matters within his knowledge, but the said witness cannot be asked about his testimony before such committee or opinions formed by him as a result of said committee hearings.

 63 P.S. § 425.4.

holding that an IPA model HMO such as HMO PA is not a "health care provider" within the meaning assigned to that phrase by the Act and is not, therefore, entitled to the protection of its confidentiality provision. *McClellan v. Health Maintenance Organization of Pennsylvania,* 442 Pa.Super. 504, 660 A.2d 97 (1995) (*McClellan II* ).[7]

We are asked to decide if the Superior Court erred in reversing the trial court's decision, which held that the documents requested by plaintiffs are privileged and non-discoverable pursuant to the provisions of the Act. HMO PA argues that its form of organization meets the Act's description of a "professional health care provider" and, therefore, records regarding any internal peer review should be excluded from discovery under the Act's confidentiality provision. McClellan insists that IPA model HMOs are not health care providers, but merely insurers whose function is to coordinate the delivery of medical care and, consequently, their business records should remain open to discovery.

## *II. Statutory Interpretation*

The resolution of this question is determined by our interpretation of the terms of the Act. Section 425.2 of the Act defines "professional health care provider" as follows:

'**Professional** health care provider' means individuals or organizations who are approved, licensed, or otherwise regulated to practice or operate in the health care field under the law of the Commonwealth, *including, but not limited to,* the following individuals or organizations:

(1) A physician.

(2) A dentist.

(3) A podiatrist.

(4) A chiropractor.

(5) An optometrist.

---

7. The *McClellan II* court suggested that while Staff Model and Group Model HMOs (the two HMO organizational models not at issue in this case) may be considered health care providers under the Act, it concluded that IPA model HMOs can not.

(6) A psychologist.

(7) A pharmacist.

(8) A registered or practical nurse.

(9) A physical therapist.

(10) An administrator of a hospital, a nursing or convalescent home, or other health care facility.

(11) *A corporation or other organization operating a hospital, a nursing or convalescent home or other health care facility.*

63 P.S. § 425.2 (emphasis added). Confidentiality under the Act is extended only in civil actions brought against "a professional health care provider." 63 P.S. § 425.4. Therefore, HMO PA will enjoy protection from discovery in this instance only if it falls within the Act's definition of that term.

 It is axiomatic that a statute must be interpreted according to its terms as enacted. *See Commonwealth ex rel. Varronne v. Cunningham*, 365 Pa. 68, 73 A.2d 705 (1950). In interpreting a statute, we must at all times seek to ascertain and effectuate the legislative intent underlying its enactment. 1 Pa.C.S. § 1921(a); *Pennsylvania Financial Responsibility Assigned Claims Plan v. English*, 541 Pa. 424, 664 A.2d 84 (1995). When construing a statute, we must follow the letter of the statute if its words are unambiguous, but when its words are not explicit, we must ascertain the General Assembly's intent by looking to the Statutory Construction Act, 1 Pa.C.S. § 1901 *et seq. DeLellis v. Borough of Verona*, 541 Pa. 3, 660 A.2d 25 (1995).

While the definition of "professional health care provider" set forth in the Act does not specifically include IPA model HMOs, its terms are broad enough that we may or may not read the Act as explicitly excluding such organizations. The words of the Act defining "health care provider," then, are ambiguous. Section 1921(c) of the Statutory Construction Act therefore requires us to ascertain the intention of the General Assembly. 1 Pa.C.S. § 1921(c).

## A. Purpose of the Act and Intention of the Legislature

 Regarding the Act's purpose, our courts have held that:

> [t]he Act was promulgated to serve the legitimate purpose of maintaining high professional standards in the medical practice for the protection of patients and the general public. The Act represents a determination by the Legislature that, because of the expertise and level of skill required in the practice of medicine, the medical profession itself is in the best position to police its own activities.

*Cooper v. Delaware Valley Medical Center,* 428 Pa.Super. 1, 14, 630 A.2d 1, 7 (1993), *affirmed* 539 Pa. 620, 654 A.2d 547 (1995), cited in *Corrigan v. Methodist Hospital,* 857 F.Supp. 434 (E.D.Pa.1994). The Federal District Court of Pennsylvania has noted that the Act

> seeks to foster the greatest candor and frank discussion at medical review committee meetings.... [T]hrough grants of immunity and confidentiality the state hopes to encourage peer evaluation of health care provided so as to (1) improve the quality of care rendered; (2) reduce morbidity and mortality; and (3) keep within reasonable bounds the costs of health care.

*Robinson v. Magovern,* 83 F.R.D. 79, 86 (W.D.Pa.1979). We accept these statements as accurate articulations of the Act's purpose.

 Turning to the definitional text of Section 425.2, we must determine whether the legislature may have intended to embrace IPA model HMOs with the phrase "including, but not limited to" and the accompanying list of examples of people and entities. It is widely accepted that general expressions such as "including, but not limited to" that precede a specific list of included items should not be construed in their widest context, but apply only to persons or things of the same general kind or class as those specifically mentioned in the list of examples. *See Roberts v. General Motors Corporation,* 138 N.H. 532, 643 A.2d 956 (1994), and *Mahoney v. Baldwin,* 27 Mass.App.Ct. 778, 543 N.E.2d 435, *review denied,* 406 Mass.

1102, 546 N.E.2d 375 (1989) (wherein the New Hampshire Supreme Court and the Massachusetts Court of Appeals, respectively, held that the phrase "including but not limited to" preceding a representative listing of prohibited acts or practices in a statute limits applicability of that statute to the types of acts listed). Under our statutory construction doctrine *ejusdem generis* ("of the same kind or class"), where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated. *Steele v. Statesman Insurance Company,* 530 Pa. 190, 607 A.2d 742 (1992); *Summit House Condominium v. Com.,* 514 Pa. 221, 523 A.2d 333 (1987). Where the opposite sequence is found, i.e., specific words following general ones, the U.S. Supreme Court and the courts from several other jurisdictions recognize that the doctrine is equally applicable, and restricts application of the general term to things that are similar to those enumerated. *Breininger v. Sheet Metal Workers International Association Local Union Number 6,* 493 U.S. 67, 110 S.Ct. 424, 107 L.Ed.2d 388 (1989); *see also, State v. First National Bank of Anchorage,* 660 P.2d 406 (Alaska 1982); *People v. Western Air Lines, Inc.,* 42 Cal.2d 621, 268 P.2d 723 (1954); *Smith v. Nussman,* 156 So.2d 680 (Fla.App.1963); *Farley v. Marion Power Shovel Company,* 60 Ill.2d 432, 328 N.E.2d 318 (1975).

Concerning the language at issue, of the eleven listed terms included in the statute's definition of professional health care provider, nine are titles of individual health care workers. The remaining two are an administrator, and a corporation or other organization operating or administering a "hospital, a nursing or convalescent home, or other health care facility." 63 P.S. § 425.2. Clearly, the list of health care providers set forth in Section 425.2 includes only (1) immediate or direct health care practitioners, and (2) administrators of medical facilities, be they individuals or organizations. HMO PA is apparently not a direct health care provider. It may enjoy the protection of the Act, then, only if it may be regarded as an administrator of a medical facility.

## B. Application of Act's Confidentiality Provision

The *McClellan II* court accurately summarized the structure of an IPA model HMO as follows:

The IPA model HMO is an HMO 'that contracts for delivery of services with a partnership, corporation, or association whose major objective is to enter into contractual arrangements with health professionals for the delivery of such health services.' 28 Pa.Code § 9.2. In this model, therefore, the HMO contracts with an IPA, a pre-existing partnership or corporation of physicians, who then provides the health care for participating members. The typical arrangement in the IPA model HMO is that its physicians usually work in their own offices, use their own equipment, and keep their own records. The HMO pays the IPA a specified amount per subscriber, called 'capitation.'[fn.] The IPA then pays the physician on a fee-for-service basis.

[fn.] A 'capitation' is an actuarially determined amount prepaid by a [sic] HMO to the primary physician for each patient who has chosen that physician to provide professional health care services.

*McClellan II*, 442 Pa.Super. at 512, 660 A.2d at 100 (citation omitted; footnote in original). Clearly, an IPA model HMO, by definition, operates without a central health care facility. As the court noted in *McClellan I*, a modified IPA model HMO such as HMO PA has no facilities or equipment and thus cannot oversee patient care within its walls. *McClellan I*, 413 Pa.Super. at 139–140, 604 A.2d at 1059. Therefore, HMO PA cannot be regarded as the administrator of a health care facility.

### III. Conclusion

Because an IPA model HMO is neither a direct health care practitioner, nor the administrator of a health care facility, we must conclude that the legislature did not intend that IPA model HMOs be embraced by the confidentiality protections of the Act. The legislature has defined its purpose only to the extent that it extended a confidentiality privilege to those categories of groups enumerated in Section 425.2 of the Act.

We agree with the accurate conclusion of the *McClellan II* court that if HMO PA desires coverage by the Act, it should direct its arguments to the General Assembly.

Accordingly, we affirm the Order of the Superior Court and remand to the trial court for the case to continue consistent with this Opinion.

NIX, Former C.J., did not participate in the consideration or decision of this case.

FLAHERTY, C.J., concurs in the result.

ZAPPALA, J., files an opinion in support of reversal in which CASTILLE, J., joins.

NIGRO, J., files an opinion in support of reversal.

### *OPINION IN SUPPORT OF REVERSAL*

ZAPPALA, Justice.

I would reverse the decision of the Superior Court. The Opinion in Support of Affirmance erroneously concludes that an IPA model HMO is not of the same general nature or class as an organization operating a hospital and therefore the confidentiality provision of the Peer Review Protection Act is not applicable. This conclusion is inconsistent with the practical effect of the Superior Court's decision in this very case in *McClellan I,* 413 Pa.Super. 128, 604 A.2d 1053, *allocatur denied,* 532 Pa. 664, 616 A.2d 985 (1992). Simply put, IPA model HMOs have been held to have the same duties as hospitals to select and retain competent physicians. As the confidentiality provision of the Act directly relates to the review committee proceedings concerning the selection of doctors, I find that the two organizations are of the same general nature or class and that both should be afforded the same protection.

The Act protects a "professional health care provider" from the compelled disclosure in a civil action of evidence or records presented at proceedings of peer review committees. 63 P.S. § 425.4. The term "professional health care provider" is de-

fined as including, *inter alia,* a "corporation or other organization operating a hospital, a nursing or convalescent home or other health care facility." 63 P.S. § 425.2(11). Employing the doctrine of *ejusdem generis,* the Opinion in Support of Affirmance holds that the lists of health care providers set forth in Section 425.2 include only immediate or direct health care practitioners and administrators of medical facilities. It states that because an IPA model HMO has no facilities or equipment, it cannot oversee patient care within its walls and thus does not fall within the categories protected under the Act.

The flaw in this analysis is evident upon examination of the Superior Court's decision in *McClellan I.* The trial court in *McClellan I* sustained Appellants' demurrer to the complaint [1] and the Superior Court reversed. In regard to the corporate negligence claim, the Superior Court noted the four general areas of hospital duties: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients. *Id.* at 139, 604 A.2d at 1058–59, citing, *Thompson v. Nason Hospital,* 527 Pa. 330, 338–40, 591 A.2d 703, 706–707 (1991).

The court then compared an IPA model HMO to a hospital in the context of nondelegable duties and found that

> [w]hile [an IPA model HMO] could be viewed as having "assumed the role of a comprehensive health center", only two of the four duties defined by the Court in *Thompson* could be imposed upon a modified IPA model HMO since such an HMO has no facilities or equipment and thus cannot "oversee .... patient care [within its walls]." It is reasonable, however, to require that an IPA model HMO "select

---

1. Appellees' complaint asserted causes of action in assumpsit and trespass based upon ostensible agency, corporate negligence, breach of contract/breach of warranty, and intentional misrepresentation and fraud.

and retain only competent physicians" and "formulate, adopt and enforce adequate rules and policies to ensure quality care for [its subscribers]."

*Id.* at 139, 604 A.2d at 1059 (citations omitted).[2]

Hospitals and IPA model HMOs are therefore sufficiently similar as to impose on both a duty to select and retain competent physicians. The fact that the two organizations conduct distinct operations regarding the manner by which the patient care is delivered does not alter this conclusion. The duty of the IPA model HMO at issue does not relate to the facilities wherein the patient care is given but rather to the selection of doctors who provide that care. Thus, IPA model HMOs merit the same protection as is afforded to hospitals.

Moreover, I agree with the trial court that excluding IPA model HMOs from the Act's confidentiality provision would allow a plaintiff to obtain otherwise confidential review committee information by joining an HMO in the lawsuit involving its doctors. By alleging a theory of corporate negligence, a plaintiff could obtain peer review information beneficial to his claim against an individual doctor by requesting the information to substantiate his corporate negligence claim. This flies in the face of the purpose of the Act which is to shield the discussions that take place in medical review meetings to foster candor and frank opinions concerning prospective doctors' qualifications and patient care.

CASTILLE, J., joins in this Opinion in Support of Reversal.

### *OPINION IN SUPPORT OF REVERSAL*

NIGRO, Justice.

I agree with Mr. Justice Zappala that Appellants should be afforded the protections of the confidentiality provision of the

---

**2.** To be precise, the *McClellan I* court found that it was unnecessary to extend the theory of corporate negligence to IPA model HMOs in order to find that such HMOs have a non-delegable duty to select and retain only competent physicians. Instead, Section 323 of the Restatement (Second) of Torts imposes an identical duty for purposes of liability regarding services rendered. Regardless of where the duty arises, it is clear from *McClellan I* that it exists.

Peer Review Protection Act, 63 P.S. § 425.4. I write separately because I reach this conclusion through somewhat different reasoning.

Under the Peer Review Protection Act, a review committee's records are not discoverable in any civil action against a professional health care provider. 63 P.S. § 425.4. At issue is whether Appellants, IPA model HMOs, are professional health care providers under the Act.

A professional health care provider is an individual or organization approved, licensed or otherwise regulated to practice or operate in the health care field. *Id.* § 425.2. The statutory definition lists 11 examples of professional health care providers and includes administrators of health care facilities and organizations operating health care facilities. *Id.* § 424.2(10), (11).

Health maintenance organizations (HMOs) are licensed to operate in the health care field under the Health Maintenance Organization Act, 40 P.S. §§ 1551–1568, and thus satisfy the general definition of professional health care provider. Under principles of statutory construction, HMOs must also be in the same general class as one of the enumerated examples to be deemed professional health care providers. HMOs are unlike the nine direct providers listed as examples in the statute. *See id.* § 424.2(1)–(9). As the majority recognizes, whether HMOs are in the same general class as administrators of health care facilities or organizations operating health care facilities is subject to interpretation.

Under the Health Maintenance Organization Act, all HMOs must provide or arrange for patient care. The Act provides that HMOs shall:

(1) Provide either directly or through arrangements with others, basic health services to individuals enrolled;

(2) Provide either directly or through arrangements with other persons, corporations, institutions, associations or entities, basic health services; and

(3) Provide physicians' services (i) directly through physicians who are employes of such organization, (ii) under

arrangements with one or more groups of physicians (organized on a group practice or individual practice basis) under which each such group is reimbursed for its services ... or (iii) under similar arrangements which are found by the secretary to provide adequate financial incentives for the provision of quality and cost-effective care.

40 P.S. § 1554(b). Basic health services include as a minimum, emergency care, inpatient hospital and physician care, ambulatory physician care, and outpatient and preventive medical services. *Id.* § 1553. This statutory mandate to provide or arrange for patient care puts HMOs in the same class as administrators of health care facilities and organizations operating health care facilities which also provide or arrange for patient care.

The majority holds that an IPA model HMO cannot be regarded as an administrator of a health care facility because it cannot oversee patient care within its walls. Majority Opinion at 806. This conclusion ignores the reality of health care today. A corporation operating a health care facility— one of the examples of a professional health care provider in the statute—may not be in a place where it can oversee patient care "within its walls." More importantly, HMOs dictate the care provided in health care facilities. They prescribe the tests patients receive, the doctors patients see, and the time patients stay in health care facilities. HMOs administrate, directly or through contracts with physician groups, health care facilities.

Because HMOs manage patient care, they have the same duty as other health care facilities to select and retain competent physicians. *McClellan v. Health Maintenance Organization of Pennsylvania*, 413 Pa.Super. 128, 139–40, 604 A.2d 1053, 1058–59 (1992). They may be held liable for the failure to do so. *Id.* To fulfill this responsibility, HMOs, like other health care facilities, evaluate and review doctors' qualifications and choose doctors to provide their subscribers' care. HMOs conduct peer review to select competent doctors. If other health care facilities that conduct peer review for this

purpose are protected from producing confidential peer review documents, HMOs also should be protected.

This conclusion comports with the Peer Review Protection Act's purpose. The Act seeks to foster the greatest candor and frank discussion at peer review committee meetings. *Robinson v. Magovern,* 83 F.R.D. 79, 87 (W.D.Pa.1979). Through confidentiality, the state hoped to encourage peer evaluation of health care and improve the quality of the care rendered. *Id.* Allowing discovery of HMO peer review documents may impede the frank discussion the Act intended to promote and hamper the quality of care.

Finally, the majority decision presents a practical problem. This is a consolidated action against the allegedly negligent doctor and the HMOs. If HMO peer review materials are discoverable, the jury may hear potentially damaging information about the doctor's past. This is relevant against the HMOs under the theory that they negligently selected and retained the doctor but wholly irrelevant against the allegedly negligent doctor. Even with a limiting instruction, it is hard to imagine that the jury could disregard such information when considering the doctor's negligence.

I conclude that HMOs are in the same class as health care facility administrators and operators under the Act. HMOs are thus professional health care providers and entitled to the protections of the Act's confidentiality provision. Accordingly, I dissent.