**Venosh v. Henzes**

C.P. of Lackawanna County, No. 11 CV 3058

*Gary Solomon* and *Justin L. Groen*, for plaintiff.

*Eugene P. Feeney* and *Noah E. Katz*, for defendants Jack Henzes, M.D. and Scranton Orthopedic Specialists, P.C.

*James A. Doherty, Jr.*, for defendant Cindy S. Anderson, PA-C.

*Timothy E. Foley*, for defendant Moses Taylor Hospital.

*Matthew L. Bleich*, for records deponents Blue Cross of Northeastern Pa. and First Priority Health.

NEALON, *J.*, Aug. 8, 2014—Plaintiff's discovery appeal in this medical malpractice action presents an issue of first impression in Pennsylvania: whether a "quality of care" review conducted by a plaintiff's own health insurance company concerning the medical treatment that the plaintiff received from the defendant health care providers is protected from discovery by the Peer Review Protection Act ("PRPA"), 63 P.S. §§ 425.1-425.4? Blue Cross of Northeastern Pennsylvania ("Blue Cross") contends that its entire "quality of care" review, including its external peer review by a "same/similar specialist," is shielded from discovery under the act since the statute's definition of a "review organization" includes "a health

insurance review committee" and "a hospital plan corporation review committee," and Blue Cross utilized "professional health care providers" to perform its "quality of care" review.

The language of the PRPA, and the relevant case law interpreting that statute in comparable contexts, support the conclusion that the discovery protections afforded by the act apply only to peer reviews which are initiated and completed by organizations or individuals that provide health care services, rather than those entities that sell health insurance. Since Blue Cross is neither a direct health care practitioner, nor the administrator or operator of a health care facility, its "quality of care" reviews are not immune from discovery under the PRPA. The act's peer review provisions may be extended to health insurance companies or hospital plan corporations only by legislative amendment of that statute. As presently worded and construed by the appellate courts, the PRPA does not protect Blue Cross's "quality of care" review from discovery, and for that reason, plaintiff's *de novo* discovery appeal will be granted.

## I. FACTUAL BACKGROUND

Plaintiff, Ann Marie Venosh ("Venosh"), has filed this professional liability action against an orthopedic surgeon, Jack Henzes, M.D. ("Dr. Henzes"), his surgical assistant, Cindy S. Anderson, PA-C, and orthopedic practice group, Scranton Orthopedic Specialists, P.C., and the Moses Taylor Hospital ("Moses Taylor"), alleging injuries related to a left total knee replacement surgery that Dr. Henzes performed on Venosh at Moses Taylor on June 11, 2009.

72

(Docket entry no. 47 at ¶¶ 1-3; docket entry no. 48 at ¶¶ 1-3). Venosh's health insurance company at the time of her surgery and post-operative treatment was First Priority Health IPA-HMO ("First Priority"), a subsidiary of Blue Cross of Northeastern Pennsylvania ("Blue Cross"). (Docket entry no. 81 at p. 2). Blue Cross is a "hospital plan corporation" under 40 Pa. C.S. §§6101 et seq., *Ambulance Association of Pennsylvania v. Highmark, Inc.*, 794 F. Supp. 2d 569, 575 (W.D. Pa. 2011), *aff'd*, 464 Fed. Appx. 64 (3d Cir. 2012), and operates a nonprofit hospital plan which provides hospitalization and related health benefits to plan subscribers for a fee. *See Chow v. Rosen*, 571 Pa. 369, 371 n. 1, 812 A.2d 587, 588 n. 1 (2002).

At the time of Venosh's treatment at Moses Taylor, Blue Cross had procedures in effect governing its initiation and performance of "Quality of Care" reviews of treatment furnished to its insureds. Under its Procedure Statement 437-0077, Blue Cross institutes such a review upon its receipt of "a quality of care concern, identified as either a complaint or an adverse outcome," which may be generated "externally" by an insured, practitioner or health care facility or "internally" by any department within Blue Cross or First Priority. (Blue Cross of NEPA Procedure Statement 437-0077, filed as docket entry no. 90, at pp. 1, 4). Blue Cross's Quality Management Nurse Analyst ("Nurse Analyst") is responsible for gathering the necessary information and preparing "a written detailed summary of the quality of care concern," including "a delineation of all quality of care issues identified for the specific practitioner/facility for the last three (3) years." (*Id.* at p.3).

The Nurse Analyst's written summary is forwarded to Blue Cross's Medical Director "for review, staging, and recommendation," which "may include but are not limited to: refer to peer review process (please refer to Procedure Statement 437-0098), present immediately to the Credentialing Committee for action, require the practitioner/facility to submit a plan of corrective action to prevent further issues, assign a stage, or track and trend." Blue Cross's quality procedures recognize the following "staging" categories:

1. QM0: No quality concern evident or potential for adverse effects

2. QM1: A quality concern, which had a potential for or caused a minor effect on the [insured]

3. QM2: A quality concern, which had the potential for a significant adverse effect on the [insured] but did not result

4. QM3: A quality concern, which resulted in a significant adverse effect on the [insured]

(*Id.* at p. 4). A "Track and Trend" is defined as "[a]n adverse outcome that is not fully investigated (because of, but not limited to, a lack of information or an informal complaint) [and] is placed in the track and trend process." (*Id.*). Pursuant to Section IV (D)(11) of that procedure statement, any practitioner or facility "with a trend of three (3) or more of the same/similar staged QM0's, QM1's, or Track and Trend issues will be presented to the credentialing committee for further action at the time of recredentialing," whereas a practitioner or facility "with

one (1) QM2 or QM3 will be presented to the credentialing committee at the time of recredentialing, unless the issue is determined to be egregious by the chair of the credentialing committee," in which event "it will then be presented at the time of occurrence."[1] (*Id.*).

_____

1. Section IV(D)(11) of Procedure Statement 437-0077 varies slightly from Section IV(I) of Procedure Statement 437-0098 regulating the referral of a "quality of care" concern for "peer review consensus." Section IV(I) of the latter procedure provides for the automatic presentation of any practitioner or facility "with a trend of three (3) or more of the same/similar staged QM1 's...to the Credentialing Committee for further action." (Procedure Statement 437-0098 at p. 2). Unlike Procedure Statement 437-0077 which authorizes the presentation of one QM2 or QM3 "at the time of occurrence" if the issue is deemed "egregious by the Chair of the Credentialing Committee," Policy Statement 437-0138 states that a practitioner or facility "with one (1) QM2 or QM3 will be presented to the Credentialing Committee either at the time of the occurrence or when the specific practitioner/ facility is being recredentialed (this is at the discretion of the Medical Director)." (*Id.*). Although Procedure Statement 437-0077 also requires any practitioner or facility with a trend of three or more of the same/ similar staged QMO's or Track and Trend issues to be "presented to the Credentialing Committee for further action at the time of recredentialing," Section IV(I) of Procedure Statement 437-0098 simply states that "[a] II QMO and Track and Trend issues will be reviewed at the end of the reporting year (at the discretion of the Medical Director, these may also be presented to the Credentialing Committee for further action)." (*Id.*).
Procedure Statement 437-0113 governs "Recredentialing of Practitioners" and "describe[s] the policy associated with verifying that Practitioners continue to meet all criteria for continuing participation in the First Priority Health (FPH) network as outlined in the respective Practitioners agreements." (Docket entry no. 93 at p. 1). That policy statement states that "FPH shall recredential all physicians and other licensed independent practitioners," and is required to "complete a thorough Recredentialing review of all Practitioners at least every 36 months." (*Id.* at pp. 1-2). First Priority's "Quality Management Department" must include in the Practitioners' "profile for review" any "member complaints and grievances/quality of care concerns and interventions as appropriate/adverse event information and follow-up." (*Id.* at p. 5). Policy Statement 437-0115 addresses the "Recredentialing of Organizational Providers," and sets forth "the policy associated with verifying that the Organizational Provider continues to meet all criteria for continuing participation in the network as outlined in the respective Organizational Provider agreements." (Docket entry no. 94 at p. 1). Policy Statement 437-0115 charges "the plan" with the responsibility to "reevaluate Organizational Providers," but unlike Policy Statement

Blue Cross Procedure Statement 437-0098 "describes the procedure of referring a quality of care concern file to a same or similar specialist for staging and peer review consensus." (Docket entry no. 90, Blue Cross of NEPA Procedure Statement 437-00098 at p. 1). If "the medical director has determined [that] a need for same/similar specialist review is necessary," Blue Cross retains an "external independent third party review organization... to perform [a] peer review." (*Id.*). Following that review, the "external third party review organization" prepares "peer review staging and recommendations," which are reviewed by Blue Cross's Medical Director who "makes the final determination of the staging." (*Id.*).

Once Blue Cross's "staging" decision has been entered "into the appropriate quality management tracking logs and DOL database," the nurse analyst forwards a letter "to the practitioner/facility involved in the [quality of care] concern with the outcome of the investigation, recommendations and request for a plan of corrective action, if applicable." (*Id.* at p. 2). Blue Cross's Policy Statement 437-0138, entitled "eisclosure of quality of care reviews, decisions and related information," addresses the disclosure of its quality investigations, and provides that the "[r]esults of these activities/ investigations shall not be released to anyone but the practitioner/facility involved and to the credentialing committee." (Docket entry no. 90, Blue Cross of NEPA Policy Statement 437-0138 at p. 1).

---

437-0113, does not expressly require review or consideration of member complaints or quality of care concerns and interventions. (*Id.* at pp. 1-5).

When Dr. Henzes was asked during his discovery deposition whether he had "given any statements to any insurance companies regarding what happened to Ann Marie Venosh," he replied that he had provided a statement to "Blue Cross." (Deposition testimony of Jack Henzes, M.D., on 7/18/12 at pp. 50-51, filed as docket entry no. 89). After Dr. Henzes' counsel voiced his contention that Dr. Henzes' statement to Blue Cross was "protected by peer review," counsel for Venosh attempted to question Dr. Henzes "regarding the circumstances of that statement to be able to make a record as to whether it was peer review or not, and for any future potential [discovery] motions." (*Id.* at pp. 51-52). Specifically, without asking Dr. Henzes to disclose the contents of his statement to Blue Cross, Venosh's counsel inquired whether: (1) Dr. Henzes was "contacted by someone from Blue Cross regarding what happened to Ann Marie Venosh;" (2) Dr. Henzes was "asked by Blue Cross to write out what you recall happening to Ann Marie Venosh;" (3) Dr. Henzes was "told [by Blue Cross] that they were doing a peer review on Ann Marie Venosh;" (4) Dr. Henzes had "seen any reports prepared by Blue Cross...in connection with what happened to Ann Marie Venosh;" and (5) the statement that Dr. Henzes "gave to Blue Cross was a written, typed, or a taped recorded statement." (*Id.* at pp. 52-53). On each occasion, Dr. Henzes' counsel objected to those areas of preliminary inquiry and directed Dr. Henzes not to answer

the questions posed.[2] (*Id.*). As a result, Venosh expressly "reserve[d] [her] right to redepose [Dr. Henzes] if that statement he gave, or any of the alleged materials that have been objected to as peer review, are later produced and contain information which may warrant a re-deposition." (*Id.* at p. 54).

On August 21, 2013, Venosh served a records subpoena upon Blue Cross seeking the production of its "investigative records" pertaining to "Venosh's June 11, 2009 surgeries and hospitalization at Moses Taylor Hospital," including any communication "sent [to] or received [from]...Moses Taylor Hospital, Dr. Jack Henzes, Dr. Michael Sunday" or any other health care provider. (Docket entry no. 81, exhibit A). In a letter dated August 23, 2013, Blue Cross's Privacy and security specialist advised Venosh that "[i]n order to process the subpoena...that you submitted to Blue Cross of Northeastern Pennsylvania," Venosh was required to submit an "original copy" of another subpoena "with a raised seal made out to First Priority Health." (*Id.*, Exhibit B). Consequently, on September 4, 2013, Venosh

---

2. In *King v. Stefenelli*, 862 A.2d 666 (Pa. Super. 2004), the testimony of a pathologist, which made reference to his participation in a peer review conference at the hospital following the patient's death, was found to be properly admitted in a medical malpractice suit since the pathologist's testimony "did not detail the evidence, findings, recommendations, evaluations or opinions undertaken in any peer review proceeding." *Id.* at 673. Dr. Henzes was never asked to reveal the findings or conclusions of Blue Cross's investigation, or to detail the evidence that was reviewed by Blue Cross during its quality assurance review. Instead, he was merely questioned whether he was contacted by Blue Cross, was advised by Blue Cross that they were conducting a peer review, had reviewed any investigative reports prepared by Blue Cross, or had furnished a written or recorded statement to Blue Cross. None of those foundational inquiries required Dr. Henzes to divulge the results of Blue Cross's investigation or the specific evidence which Blue Cross had reviewed.

forwarded a records subpoena to First Priority demanding production of the requested documents within twenty days. (*Id.*, exhibit C).

On October 16, 2013, Blue Cross informed Venosh that it had produced "all relevant and unprivileged documents," and was withholding any investigative materials on the ground that they are "privileged documents and not subject to discovery" under of the Peer Review Protection Act ("PRPA"). (Docket entry no. 83, exhibit 2). Blue Cross further requested that Venosh immediately "withdraw the subpoena of September 4, 2013." (*Id.*). By letter dated October 22, 2013, Venosh declined to withdraw her subpoena and instead demanded production of the requested documents. (Docket entry no. 66 at ¶ 9; docket entry no. 68 at ¶ 9).

On November 7, 2013, Blue Cross filed a "motion to quash" Venosh's subpoena directed to First Priority, and requested the entry of "a protective order pursuant to Pa.R.C.P. 234.4(b) and 4012(a)." (Docket entry no. 66 at p. 5). In support of its motion, Blue Cross filed an affidavit from its Medical Director attesting that Blue Cross received "an internal quality review referral concerning the treatment of Ann Marie Venosh by one or all of the defendants in the above-captioned action," as a result of which a "Peer Review process...was undertaken by [Blue Cross's] quality review nurses and physicians concerning the medical treatment rendered to Ms. Venosh by the aforementioned providers." (Docket entry no. 74, exhibit A at ¶ 4). The medical director further certified that Blue Cross's "peer review process is conducted solely on behalf of the parent health plan [Blue Cross], and is conducted by

[Blue Cross] nurses and physicians and not undertaken on behalf of any insuring entity or company, including First Priority Health or any other HMO." (*Id.* at ¶3).

Special trial master Henry P. Burke issued an order on November 7, 2013, denying Blue Cross's motion to quash and directing the production of "all records requested in [Venosh's] subpoena within ten (10) days of the date of this order." (Docket entry no. 67). However, on December 5, 2013, Master Burke vacated that discovery order, and on January 6, 2014, granted Blue Cross's motion to quash Venosh's subpoena, finding that Venosh was "prohibited from seeking information and/or documents referenced in that subpoena from Blue Cross of Northeastern Pennsylvania or its affiliate First Priority Health." (Docket entry nos. 72, 75). On January 16, 2014, Venosh filed a timely *de novo* appeal of the master's order of January 6, 2014.[3] (Docket entry no. 77).

Venosh contends that the analysis of Dr. Henzes' care was conducted by First Priority, not Blue Cross, as a result of which that review is not protected by the PRPA since an IPA model HMO is not a "professional health care provider" or an administrator of a health care facility so as to be covered by the confidentiality provisions of the PRPA. (Docket entry no. 81 at pp. 6-7). Alternatively, in the event that it is determined that the investigation in question was performed by Blue Cross, Venosh posits that the PRPA is nonetheless

---

3. Under Lacka. Co. R.C.P. 4000.1, discovery motions must initially be presented to and decided by the court-appointed Special Trial Master whose ruling "may be appealed *de novo*" to the court of common pleas within ten days of the master's decision. *Sandvik, Inc. v. Mecca C.& S, Inc.*, 2014 WL 2134392, at * 3 (Lacka. Co. 2014).

inapplicable inasmuch as "the review was conducted by First Priority/Blue Cross for their business purposes arising out of their contract of insurance with [Venosh]," rather than "for the purpose of improving the quality of medical care." (*Id.* at p. 14). Venosh submits that "by withholding its investigation of Ms. Venosh's care, her insurer is breaching its fiduciary duty to her and undermining her search for the truth about what happened to her." (Docket entry no. 87 at p. 4).

In its responsive brief, Blue Cross maintains that it initiated an investigation of "Ms. Venosh's care in response to an internal quality review referral concerning the treatment she had received by one or all of the defendants in this action," and that the review "process is conducted solely by [Blue Cross] nurses and physicians on behalf [Blue Cross]." (Docket entry no. 83 at p. 4). However, in his affidavit that was submitted after the oral argument of counsel on July 14, 2014, Blue Cross's Medical Director verified that Blue Cross also hired a third party "board-certified orthopedic surgeon to conduct the initial evaluation of Ms. Venosh's quality of care," and that "the orthopedic surgeon submitted a report of his evaluation to [Blue Cross's] Medical Director and to the Nurse Analyst." (Docket entry no. 91 at ¶¶ 7-8). During oral argument, counsel for Blue Cross indicated that to his knowledge, the findings of Blue Cross's investigation "were kept within Blue Cross of Northeastern Pennsylvania" and were never communicated to Venosh, Dr. Henzes, Moses Taylor or any other defendant. (Transcript of proceedings ("T.P.") on 7/14/14 at pp. 21-24). In his post-argument affidavit

dated July 17, 2014, Blue Cross's Medical Director attests that although the third party orthopedic surgeon's "report itself was not shared with anyone outside [Blue Cross], a summary of the findings was communicated by letter to Ms. Venosh's providers." (Docket entry no. 91 at ¶ 10).

Since the PRPA defines a "review organization" as including "a hospital plan corporation review committee," Blue Cross contends that its records are immune from discovery under that Act due to the fact that "the entity that performed the peer review was [Blue Cross], which is a hospital plan corporation and which is not an IPA-HMO." (Docket entry no. 83 at p. 10). Blue Cross states that "[t]he stakes in this appeal are extremely high," and argues that if it is required to produce its "investigatory materials, then insurance companies throughout the state of Pennsylvania will be hesitant to avail themselves of the peer review process, and the quality of medical care in this state will accordingly suffer." (*Id.* at pp. 2-3, 17).

Oral argument on Venosh's discovery appeal was conducted on July 14, 2014, and in compliance with our post-argument orders, Blue Cross filed various procedure statements and policy statements on July 18, 2014, and August 7, 2014. Venosh's appeal is now ripe for disposition.

## II. DISCUSSION

### (A) STANDARD OF REVIEW

Under Pa.R.C.P. 4003.1, "discovery is liberally allowed with respect to any matter, not privileged, which

is relevant to the cause being tried." *Berg v. Nationwide Mut. Ins. Co.. Inc.*, 44 A.3d 1164, 1178 n. 8 (Pa. Super. 2012), *app. denied*, 619 Pa. 719, 65 A.3d 412 (2013). As the entity asserting a peer review privilege under the PRPA, Blue Cross has the "burden to establish that any requested documents are shielded from discovery by the Act." *Joe v. Prison Health Services. Inc.*, 72 A.2d 24, 33 (Pa. Cmwlth. 2001). Generally, "Pennsylvania law does not favor evidentiary privileges," *In re L. F.*, 995 A.2d 356, 360 (Pa. Super. 2010), *app. denied*, 608 Pa. 641, 9 A.3d 630 (2010), and all doubts regarding the discoverability of information or documents "should be resolved in favor of permitting discovery." *Koken v. One Beacon Ins. Co.*, 911 A.2d 1021, 1025 (Pa. Cmwlth. 2006); *McAndrew v. Donegal Mut. Ins. Co.*, 56 Pa. D. & C. 4th 1, 7 (Lacka. Co. 2002).

## (B) PEER REVIEW PROTECTION ACT

The PRPA grants qualified immunity to health care providers who participate in a peer review evaluation of health care services furnished by other professional health care providers, and establishes an evidentiary privilege applicable to peer review proceedings and records. *Venosh v. Henzes*, 2013 WL 3725157, at * 5 (Lacka. Co. 2013), *aff'd*, No. 1498 MDA 2013 (Pa. Super. July 11, 2014).[4] Section 425.4 of the act states that "[t]he

---

4. In *Venosh*, we held that two incident reports that were prepared by Moses Taylor were not protected from discovery by the PRPA, Section 311 of the Medical Care Availability and Reduction of Error ("MCare") Act, 40 P.S. § 1303.311, or Section 299b-22 of the federal Patient Safety Quality Improvement Act of 2005 ("PSQIA"), 42 U.S.C. § 299b-22. *Venosh, supra*, at *6-12. After we certified our decision for an interlocutory appeal pursuant to 42 Pa.C.S.A. § 702(b) and Pa.R.A.P. 1311, *see Venosh v. Henzes*, 2013 WL 5701655 (Lacka. Co. 2013), the

proceedings and records of a review committee shall be held in confidence and shall not be subject to discovery... in any civil action against a professional health care provider arising out the matters which are the subject of evaluation and review by such committee...." 63 P.S. § 425.4. Section 425.2 of the PRPA defines a "review organization" as "any committee engaging in peer review, including...a health insurance review committee [and], a hospital plan corporation review committee," and further states that the phrase "peer review" means "the procedure for evaluation by professional health care providers of the quality and efficiency of services ordered or performed by other professional health care providers...." 63 P.S. § 425.2.

The PRPA "was promulgated to serve the legitimate purpose of maintaining high professional standards in the medical practice for the protection of patients and the general public." *Troescher v. Grody*, 869 A.2d 1014, 1020-1021 (Pa. Super. 2005). The act "represents a determination by the legislature that, because of the expertise and level of skill required in the practice of medicine, the medical profession itself is in the best position to police its own activities." *Dodson v. Deleo*, 872 A.2d 1237, 1242 (Pa. Super. 2005) (quoting *Young v. The Western Pennsylvania Hospital*, 722 A.2d 153, 156 (Pa. Super. 1998)); *Joe*, 782 A.2d at 32. The confidentiality provisions of the PRPA facilitate "comprehensive, honest, and potentially critical evaluations of medical providers by their peers in the profession." *Piroli v.*

---

Superior Court of Pennsylvania affirmed that discovery ruling in *Venosh v. Henzes*, No. 1498 MDA 2013 (Pa. Super. July 11, 2014).

*Lodico.* 909 A.2d 846, 850 (Pa. Super. 2006). Without the confidentiality protection afforded by the PRPA, "the ability of the profession to police itself effectively would be severely compromised." *Piroli, supra*; *Joe, supra*; *Young, supra.*

For the discovery protections of the PRPA to apply, the peer review materials must be the "records of a review committee" which are being sought in a "civil action against a professional health care provider" based upon matters that were the subjects of the peer review evaluation. *See Haves v. Mercy Health Corporation,* 559 Pa. 21, 29, 739 A.2d 114, 118 (1999) (stating that the intent of the legislature in adopting the PRPA "was to prevent the disclosure of peer review information to outside parties seeking to hold professional health care providers liable for negligence, while at the same time insuring that such guarantee of confidentiality did not operate to shield from discovery those rare instances in which the peer review process was misused."). To constitute a "review organization" under the act, the committee must be engaged "in peer review," which, by definition, refers to "the procedure for evaluation by professional health care providers" of the quality of care furnished by other professional health care providers. *See* 63 P.S. § 425.2. In relevant part, Section 425.2 of the PRPA defines a "professional health care provider" as "individuals or organizations who are approved, licensed or otherwise regulated to practice or operate in the health care field under the laws of the Commonwealth, including, but not limited to," a physician, dentist, podiatrist, chiropractor, optometrist, psychologist, pharmacist, registered or

practical nurse, physical therapist, administrator of a hospital, nursing or convalescent home or other health care facility, or a "corporation or other organization operating a hospital, nursing or convalescent home or other health care facility." 63 P.S. § 425.2.

Venosh maintains that First Priority and Blue Cross may not invoke the discovery protections of the PRPA since neither organization qualifies as a "professional health care provider" under the act which limits its confidentiality provisions to peer reviews undertaken "by professional health care providers." First Priority and Blue Cross contend that the investigation was conducted solely by Blue Cross, which, as "a hospital plan corporation," constitutes a "review organization" that may perform protected peer reviews under the PRPA. First Priority and Blue Cross further submit that they have satisfied the "professional health care provider" criterion since the review of the defendants' care was carried out by health care providers employed or retained by Blue Cross. (Docket entry no. 83 at pp. 9-10).

## (C) FIRST PRIORITY IPA-HMO

Venosh first argues that Blue Cross's conduct in response to her subpoena of August 21, 2013, establishes that the investigation in question was actually performed by First Priority. Venosh notes that upon receipt of her subpoena, Blue Cross informed her that her records request could only be considered if she submitted a subpoena "with a raised seal made out to *First Priority Health.*" (*See* Letter dated 8/26/13 from Renee Budzilek to Kornblau, Kornblau & Solomon, filed as docket entry no. 81, exhibit

B) (emphasis in original letter). In that regard, it also bears noting that the motion to quash that Blue Cross presented to the special trial master only sought "an order quashing the subpoena directed by Ms. Venosh to First Priority Life." (*Id.*, exhibit D at pp. 1, 5).

It is undisputed that First Priority is an IPA model HMO. (Docket entry no. 74 at p. 1). If the "quality of care" review in dispute was conducted by First Priority, it is not insulated from discovery under the applicable case law. In *McClellan v. Health Maintenance Organization of PA*, 546 Pa. 463, 686 A.2d 801 (1996) (Per Newman, J., with one justice concurring and one justice concurring in the result), the plaintiff in a professional negligence action against an HMO sought to discover any investigations that the HMO had conducted of the decedent's treating physician who allegedly failed to timely diagnose the decedent's malignant melanoma. *Id.* at 468-469 & n. 4, 686 A.2d at 803-804 & n. 4. The HMO objected to that discovery based upon the PRPA's confidentiality provision which "protects a 'professional health care provider' from compelled disclosure of proceedings and records of a peer review committee during discovery in a civil action." *Id.* at 469, 686 A.2d at 804. Per the language of the act, the HMO's peer review would be shielded from discovery only if the HMO was deemed a "professional health care provider" under the PRPA so as to be capable of performing a protected peer review. *Id.* at 471, 686 A.2d at 805 ("Therefore, HMO PA will enjoy protection from discovery in this instance only if it falls within the act's definition of that term.").

Finding the definition of "professional health care

provider" in the PRPA to be ambiguous, the Supreme Court of Pennsylvania ascertained the intention of the general assembly in enacting the PRPA, Id at 471-472, 686 A.2d at 805, and reasoned:

> Concerning the language at issue, of the eleven listed terms included in the statute's definition of professional health care provider, nine are titles of individual health care workers. The remaining two are an administrator, and a corporation or other organization operating or administering a "hospital, a nursing or convalescent home, or other health care facility." 63 P.S. § 425.2. Clearly, the list of health care providers set forth in section 425.2 includes only (1) immediate or direct health care practitioners, and (2) administrators of medical facilities, be they individuals or organizations. HMO PA is apparently not a direct health care provider. It may enjoy the protection of the act, then, only if it may be regarded as an administrator of a medical facility.

*Id.* at 473, 686 A.2d at 806. Noting that "an IPA model HMO, by definition, operates without a central health care facility" and "has no facilities or equipment and thus cannot oversee patient care within its walls," *Id.* at 474, 686 A.2d at 806, the *McClellan* Court concluded:

> Because an IPA model HMO is neither a direct health care practitioner, nor the administrator of a health care facility, we must conclude that the legislature did not intend that IPA model HMOs be embraced by the confidentiality protections of the act. The legislature has defined its purpose only to the extent that it extended a

confidentiality privilege to those categories of groups enumerated in Section 425.2 of the act. We agree with the accurate conclusion of the [Superior] Court that if HMO PA desires coverage by the act, it should direct its argument to the general assembly.

*Id.* at 474-475, 686 A.2d at 807.[5]

In *Henderson v. Biwojno*, 47 Pa. D. & C. 4th 322 (Alleg. Co. 2000), the trial court extended the holding in *McClellan* to malpractice cases in which the IPA model HMO is not a named defendant. The plaintiff in *Henderson* received "health benefits from her employer through Keystone Health Plan," and "wrote a four-page letter...to Keystone complaining about the treatment provided by [her network physician] Dr. Avolio." *Id.* at 324-325. "Upon receipt of this letter, Keystone requested plaintiff's medical records from her treating physician" and "arranged for two physicians to review the records and provide comments to Keystone on the quality of care provided by Dr. Avolio." *Id.* at 325. Keystone later forwarded a letter to plaintiff "which stated that 'your information was referred to clinical quality improvement for review,'" and that "'[a]s a health care plan, we are required to analyze complaints made against our network providers to determine if quality problems exist.'" *Id.*

5. The Superior Court similarly determined that peer reviews performed by IPA model HMOs are not protected from discovery by the PRPA since such HMOs "do not operate their own facilities, but merely act as insurers or quasi-insurers...." *McClellan v. Health Maintenance Organization of PA*, 442 Pa. Super. 504, 513-514, 660 A.2d 97, 101-102 (1995), *aff'd*, 546 Pa. 463, 686 A.2d 801 (1996).

In her subsequent medical malpractice action against her treating physicians, the plaintiff in *Henderson* sought "to obtain the evaluations of the care furnished by Dr. Avolio," and "Keystone contended] that this information [wa]s protected from discovery by the Pennsylvania Peer Review Protection Act." *Id.* "Keystone not[ed] that the definition of 'review organization' in section 425.2 includes a 'health insurance review committee,'" and argued that its review committee had performed a protected "peer review" since the evaluation had been conducted by two "professional health care providers." *Id.* at 326, 331 & n. 2. In summarizing the statutory construction issue presented, Judge R. Stanton Wettick stated: "in a civil action against a health care provider, Section 425.4 protects only evaluations conducted by a review committee; section 425.2 defines a 'review organization' as a committee engaged in peer review; and section 425.2 defines 'peer review' as the procedure for evaluation by professional health care providers." *Id.* at 330.

In rejecting the HMO's assertion that its "quality of care" review qualified as protected peer review since the investigation was conducted by two physicians, the *Henderson* court concluded:

> While Keystone arranged for professional health care providers to conduct the evaluation of the quality and efficiency of services performed by Dr. Avolio, this was an evaluation by Keystone. Consequently, the controlling issue is whether an evaluation by Keystone is an evaluation by a professional health care provider.

*Id.* at 326. Declaring that "[t]he ruling of the Superior Court

in *McClellan* that IPA model HMOs are not professional health care providers continues to be the controlling authority," judge Wettick held that "the Peer Review Protection Act does not apply." *Id.* at 331. As a result, Keystone's motion to quash the plaintiff's discovery of its quality assurance review was denied. *Id.* at 332.

Assuming *arguendo* that the "quality of care" review was conducted by First Priority, it is clearly not protected from discovery by the PRPA. Since First Priority is not a direct health care provider, nor an administrator of a health care facility, it is not a "professional health care provider" which may perform protected peer reviews under the PRPA. *See McClellan*, 546 Pa. at 474-475, 686 A.2d at 807. The fact that a physician, nurse and orthopedic surgeon conducted the "quality of care" review and "peer review" is of no consequence since the organization itself which undertakes the peer review must be a "professional health care provider" to enjoy discovery protection under the Act. *See Henderson*, 47 Pa. D. & C. 4th at 326. Accordingly, any peer review that was undertaken by First Priority of the treatment furnished by Venosh's health care providers is not shielded from discovery by the PRPA.

### (D) BLUE CROSS OF NORTHEASTERN PENNSYLVANIA

Blue Cross contends that Venosh's discovery appeal improperly "tries to conflate [Blue Cross] with First Priority," and in rebuttal, argues "that the peer review was actually conducted by [Blue Cross] which, as a hospital plan corporation, is expressly protected by the act."

(Docket entry no. 83 at p. 11). Blue Cross asserts that under Section 425.4 of the PRPA, once it established (a) that the peer review was conducted by a "review committee," and (b) that discovery of that peer review material is being sought in a "civil action against a professional health care provider arising out of the matters which are the subject of evaluation and review by such committee," Blue Cross's "Quality of Care" review of Dr. Henzes' treatment became immune from discovery. (*Id.* at p. 12).

Although the act includes "a health insurance review committee" and "a hospital plan corporation review committee" in its definition of a "review organization," it requires that "review organization" to be "engag[ed] in peer review" in order to fall within the confidentiality provisions of that statute. *See* 63 P.S. § 425.2. The same definitional section defines "peer review" as the procedure for quality evaluation by "professional health care providers," which are described as including the nine identified categories of health care workers, as well as administrators and corporate operators of hospitals, nursing or convalescence homes, or other health care facilities. *Id.* Section 425.2 of the PRPA does not include a health insurance company or a hospital plan corporation among the organizations who are licensed "to practice or operate in the health care field" and thereby constitute "professional health care providers" under the act. *See Independent Oil and Gas Association of Pennsylvania v. Board of Assessment Appeals of Fayette County*, 572 Pa. 240, 247-248, 814 A.2d 184 (2002) (under the statutory construction doctrine of *inclusio unius est exclusio alterius*, the inclusion of specific items in a statute

implies the exclusion of other matters not so included); *McClellan*, 546 Pa. at 472-473, 686 A.2d at 805-806 ("It is widely accepted that general expressions such as 'including, but not limited to' that precede a specific list of included items should not be construed in their widest context, but apply only to persons or things of the same general kind or class as those specifically mentioned in the list of examples, [citation omitted]. Under our statutory construction doctrine *ejusdem generis* ('of the same kind or class'), where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated.").

The *McClellan* holdings confirm that the discovery protections contained in the PRPA apply only to direct health care practitioners and administrators or operators of health care facilities, *McClellan*, 546 Pa. at 473-475, 686 A.2d at 806-807, and do not shield peer reviews that are performed by entities that "do not operate their own facilities, but merely act as insurers or quasi-insurers." *McClellan*, 442 Pa. Super., at 513-514, 660 A.2d at 101-102. A hospital plan corporation or health insurer cannot transform itself into a "professional health care provider" under section 425.2 of the act by simply hiring or utilizing a doctor or nurse to conduct the actual peer review. *See Henderson*, 47 Pa. D. & C. 4th at 326. The Supreme Court in *McClellan* declared that if a non-health care provider such as an IPA model HMO wishes to be covered by the peer review protection provisions of the act, "it should direct its argument to the general

assembly." *McClellan*, 546 Pa. at 475, 686 A.2d at 807. During the ensuing eighteen years since *McClellan*, the general assembly has not amended the PRPA to extend its confidentially provisions to peer reviews instituted by organizations or corporations that do not provide direct health care or operate health care facilities. Thus, in its current form, the PRPA does not protect quality reviews or peer reviews that are undertaken by hospital plan corporations which do not function as "professional health care providers." *Cf. Fanelli v. Independence Blue Cross*, 75 D. & C. 4th 10, 17 (Phila. Co. 2005) (in physician's action challenging health insurer's decision not to reinstate him as a credentialed member of the Independence Blue Cross physician network, PRPA did not protect from discovery the Credentialing Committee's deliberations by six "credentialed providers within the [Blue Cross] network who are actively engaged in patient care," since the act's definition of a professional health care provider "demonstrates that it applies to those who provide health care directly, or administer or operate a health care facility.").

The Geisinger Health System apparently recognizes that fact and has peer reviews of its Health Plan's medical and dental providers initiated and conducted by the health care provider arm of its integrated health services organization. The Geisinger System is comprised of health care facilities and clinics, Geisinger System Services which employs management and other personnel who provide services to entities in the Geisinger System, the Geisinger Health Plan, the Geisinger Foundation, and two professional liability trusts. *See Geisinger Health*

*Plan v. Commissioner of Internal Revenue Service*, 30 F.3d 494, 496 (3d Cir. 1994). In the Geisinger System, the Geisinger medical centers and clinics are "contractually obligated to provide credentials and quality assurance review of Geisinger Health Plan physicians and dentists, including those not affiliated with the Geisinger System of healthcare," and are "charged with the responsibility to review any reports of information which raise questions regarding the professional competence of any physician or dentist." *Babb v. Centre Community Hospital*, 47 A.3d 1214, 1217 n. 2 (Pa. Super. 2012), *app. denied*, 619 Pa. 719, 65 A.3d 412 (2013). Consequently, Geisinger's peer reviews of its Health Plan network physicians and dentists are undertaken by an organization that is "approved, licensed or otherwise regulated to practice or operate in the health care field," and as a result, those reviews should be protected by the PRPA since they are commenced and completed by a "professional health care provider," as per the definition of that phrase in 63 P.S. § 425.2.

The PRPA represents a legislative determination that the health care profession, not the health insurance industry, "is in the best position to police its own activities." *See Dodson*, 872 A.2d at 1242 (quoting *Young*, 722 A.2d at 156). While it is laudable that Blue Cross conducts peer reviews of the quality and efficiency of the treatment that health care professionals and facilities provide to its subscribers, only those peer reviews which are undertaken by a "professional health care provider" are immune from discovery under the act. Since Blue Cross is not a direct health care practitioner or an administrator or operator of a health care facility, it has not satisfied its burden of

establishing that its "quality of care" reviews and peer reviews are protected from discovery by 63 P.S. § 425.4. Accordingly, Blue Cross and First Priority must comply with Venosh's records subpoenas, and Venosh's *de novo* appeal of the special trial master's discovery order will thereafter be granted.

## ORDER

And now, this 8th day of August, 2014, upon consideration of "plaintiff's appeal of special trial master's order of January 6, 2014," the exhibits and memoranda of law submitted by the parties, the oral argument of counsel, and the post-argument submissions by counsel, and based upon the reasoning set forth in the foregoing memorandum, it is hereby ordered and decreed that:

1. The *de novo* discovery appeal filed by plaintiff, Ann Marie Venosh, pursuant to Lacka. Co. R.C.P. 4000.1 is granted;

2. The special trial master's order of January 6, 2014, granting the motion to quash filed by Blue Cross of Northeastern Pennsylvania is reversed; and

3. Within the next thirty (30) days, Blue Cross of Northeastern Pennsylvania and First Priority Health IPA-HMO shall comply with the records subpoenas served upon them by producing the "quality of care" review materials and "peer review" records within their possession regarding the care and treatment that plaintiff received from any of the defendants.