**[J-7-2021] [MO: Saylor, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | | |
|---|---|---|
| JAMES E. LEADBITTER AND TAMMY M. LEADBITTER, HIS WIFE | : | No. 19 WAP 2020 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Superior Court entered February 12, |
| v. | : | 2020 at No. 1414 WDA 2018, |
| | : | affirming the Order of the Court of |
| | : | Common Pleas of Allegheny County |
| KEYSTONE ANESTHESIA | : | entered September 17, 2018 at No. |
| CONSULTANTS, LTD., A CORPORATION, | : | G.D. 16-10700. |
| CHRISTOPHER MERCK, D.O., AJOY | : | |
| KATARI, M.D., JOHN P. WELDON, M.D., | : | ARGUED:  March 9, 2021 |
| LAURA V. MCNEILL, M.D., AND ST. CLAIR | : | |
| HOSPITAL | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| CARMEN PETRAGLIA, M.D. AND SOUTH | : | |
| HILLS ORTHOPAEDIC SURGERY | : | |
| ASSOCIATES, A CORPORATION | : | |
| | : | |
| | : | |
| APPEAL OF: ST. CLAIR HOSPITAL | : | |

**CONCURRING OPINION**

**JUSTICE WECHT**                              **DECIDED:  AUGUST 17, 2021**

It took just over three years for the difficulty I anticipated in *Reginelli v. Boggs*[1] to come into focus, as cases highlighting my concern completed the long journey to this

---

[1]     *See* 181 A.3d 293, 308 (Pa. 2018) (Wecht, J., dissenting).

Court.  In *Reginelli*, a divided Court found in the Peer Review Protection Act[2] a dispositive distinction between "review organizations" and "peer review committees" under the Act, despite the fact that the General Assembly saw fit to define only the former term and used them side by side without consistent distinction throughout the Act.  In this case, the Majority clarifies that resolving whether the PRPA's confidentiality provision applies in a given case should be driven by whether peer review has occurred, rather than by the nomenclature or by any one function of the health care provider conducting the review.  With that much I agree.  I also join in the Majority's disposition.[3]  But I cannot support the Majority's attempt to reconcile today's holding with *Reginelli*'s involuted and ultimately unconvincing analysis.  That endeavor, though salutary in its intent, only highlights *Reginelli*'s flaws.

The Majority in this case does a fine job of reviewing why the General Assembly deemed professional peer review so essential as to protect its participants at the limited expense of "the search for truth."[4]  No one is better positioned to evaluate the competency

---

[2]     Act of July 20, 1974, P.L. 564, No. 193, *as amended*, 63 P.S. §§ 425.1-425.4 (hereinafter the "PRPA" or the "Act").

[3]     I join the Majority's analysis and holding regarding the scope of the disclosure limitations imposed by the federal Health Care Quality Improvement Act.  Notably, the PRPA similarly distinguishes between confidential peer review materials and proceedings and the documents and information maintained in private hands from which such materials and proceedings may draw.  *See* 63 P.S. § 425.4 (providing that "information, documents or records otherwise available from original sources are not to be construed as immune from discovery or used in any such civil action merely because they were presented during proceedings of such committee").

[4]     *Commonwealth v. Stewart*, 690 A.2d 195, 197 (Pa. 1997) ("[E]xceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth.").

and performance of experts in health care-related disciplines than their peers. To ensure the candor necessary to that process, reporting professionals must be protected from adverse consequences arising from the rendering of negative assessments, the risks of which could diminish individuals' willingness to offer such assessments. To that end, the Act erects a veil of silence around peer review proceedings.[5]

In *Reginelli*, the Court tore a hole in this veil for activities it described as "credentialing," and for groups that it dubbed "review organizations" but not "review committees." I discussed my concerns in that case at length, but my view did not prevail.[6] I write separately today not to relitigate that dispute. Nevertheless, to understand my difficulty with the Majority's necessarily contrived effort to reconcile *Reginelli* with the Court's decision in this case, it is necessary first to revisit aspects of the competing views that divided the Court in *Reginelli*.

The Act seeks to protect the people who conduct or contribute to peer review in two sections. The first immunizes from civil or criminal liability any "person providing information to any review *organization*" unless the informant knew or had reason to know that the information was false or the information is "unrelated to the performance of the duties and functions of such review *organization*."[7] The second, which was the focus of both *Reginelli* and the instant case, protects peer review records from discovery in civil litigation:

---

[5]     *See* Maj. Op. at 6-8.

[6]     *See Reginelli*, 181 A.3d at 308 (Wecht, J., dissenting).

[7]     63 P.S. § 425.3(a) (emphasis added).

The proceedings and records of a review committee shall be held in confidence and shall not be subject to discovery or introduction into evidence in any civil action against a professional health care provider arising out of the matters which are the subject of evaluation and review by such committee and no person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such civil action as to any evidence or other matters produced or presented during the proceedings of such committee . . . .[8]

Both of these must be viewed relative to the unitary purpose they were crafted to serve.

By dint of the General Assembly's own choice of words, the Bill that became the PRPA was entitled "An Act providing for the increased use of peer review groups by giving protection to individuals and data who report to any group."[9] Peer review being the entire discernible reason for the PRPA's existence, the Act must be read against, and constrained by, the statutory definition of "peer review," which provides, in relevant part:

"**Peer review**" means the procedure for evaluation by professional health care providers of the quality and efficiency of services ordered or performed by other professional health care providers, including practice analysis, inpatient hospital and extended care facility utilization review, medical audit, ambulatory care review, claims review, and the compliance of a hospital, nursing home or convalescent home or other health care facility operated by a professional health care provider with the standards set by an association of health care providers and with applicable laws, rules and regulations. . . .[10]

This definition focuses upon the *activity* it describes. The provision restricts who may perform that task to "professional health care providers," and confines the protected activity to the evaluation of "the quality and efficiency of services ordered or performed." But viewed in their full statutory context, these limitations are notable for their lengthy, non-exclusive lists of individuals and activities that qualify for protection.

---

[8]    *Id.* § 425.4.

[9]    *Id.* § 425.1, Hist. & Stat. Notes.

[10]    *Id.* § 425.2.

In particular, the broad definition of professional health care providers signals the General Assembly's intention to encompass all aspects of health care delivered—for both people *and* animals. The list includes, but is by no means limited to, "individuals or organizations who are approved, licensed or otherwise regulated to practice or operate in the health care field under the laws of the Commonwealth, including . . . a physician; . . . a pharmacist; . . . a corporation or other organization operating a hospital, nursing or convalescent home or other health care facility;" an administrator of such a facility; and Pennsylvania-licensed veterinarians.[11]

In the aspects of the decision that bear upon the case now before us, the *Reginelli* Court considered whether the records of an individual reviewing a physician practicing under her charge qualified for the Act's evidentiary privilege. In answering "No," the Court did not begin with the definition of peer review, but rather searched for a comprehensive interpretation of the Act's statutory definition of "review organization," implying the interpretive posture that peer review is defined primarily by who does it rather than primarily by what is done.

First, the text of the definition that *Reginelli* sought to unpack:

> "**Review organization**" means [*1*] any committee engaging in peer review, including a hospital utilization review committee, a hospital tissue committee, a health insurance review committee, a hospital plan corporation review committee, a professional health service plan review committee, a dental review committee, a physicians' advisory committee, a veterinary review committee, a nursing advisory committee, and any committee established pursuant to the medical assistance program, and any committee established by one or more State or local professional societies, to gather and review information relating to the care and treatment of patients for the purposes of (i) evaluating and improving the quality of health care rendered; (ii) reducing morbidity or mortality; or (iii) establishing and enforcing guidelines designed to keep within reasonable bounds the

---

11      *Id.*

cost of health care. [*2*] It shall also mean any hospital board, committee or individual reviewing the professional qualifications or activities of its medical staff or applicants for admission thereto. [*3*] It shall also mean a committee of an association of professional health care providers reviewing the operation of hospitals, nursing homes, convalescent homes or other health care facilities.[12]

The *Reginelli* Court, maintaining that the plain language of the PRPA compelled its analysis, began with a tautology: "[T]he PRPA does not use the terms 'committee' and 'individual' interchangeably . . . as they connote distinct types of entities under the PRPA."[13] The Court elaborated:

> The first sentence of the definition of "review" organization defines the type of entity that constitutes a "review committee," namely, "any committee engaging in peer review." The second sentence, in contrast, contains no reference to peer review, and instead refers to a "hospital board, committee or individual" involved in the review of "the professional qualifications or activities of its medical staff or applicants thereto by a "hospital board, committee or individual." This second category of "review organizations" does not involve peer review, as that term is defined in the PRPA, which is limited to the evaluation of the "quality and efficiency of services ordered or performed" by a professional health care provider. Review of a physician's credentials[14] for purposes of membership (or continued membership) on a hospital's medical staff is markedly different from reviewing the "quality and

---

[12] *Id.* The other terms defined are "professional health care provider" and "professional society."

[13] *Reginelli*, 181 A.3d at 305.

[14] To its description of the import of the second sentence, the *Reginelli* Court appended a footnote that has since proved consequential, in which it explained its narrow account of what that sentence referred to:

> Professional "qualifications" would include, for instance, a physician's continuing maintenance of his or her board certifications, and "activities" could include clinical research initiatives, continuing education, service on professional committees or organizations and, more broadly speaking, other qualifications deemed necessary by the hospital. Credentials review permits a hospital to retain, and then maintain, a medical staff of quality professionals.

*Id.* at 305 n.10.

efficiency of services ordered or performed" by a physician when treating patients. Accordingly, although "individuals reviewing the professional qualifications or activities of its medical staff or applicants for admission thereto" are defined as a type of "review organization," such individuals are not "review committees" entitled to claim the PRPA's evidentiary privilege in its section 425.4.[15]

But this analysis stumbles out of the gate.

For one thing, the first sentence of the definition does *not* "define[] the type of entity that constitutes a 'review committee.'" Conspicuously absent from Section 425.2 and the definition of review organization is *any* definition of a "review committee," although that term recurs throughout the definition of review organization. Thus, a review organization (not a review committee, as the *Reginelli* Court maintained) is defined first as "any committee engaging in peer review." But the General Assembly broadened that description still more by two additional categories, neither of which specifically refers to "peer review" nor excludes the term. Had the General Assembly intended otherwise, the definition would not be buried in the definition of review *organization* to be unearthed by this Court at some remote future time. At the very least, the legislature would have made it plainer that it deliberately embedded a critical definition inside another definition rather than defining it separately in the same definitional section.

As for the second sentence of the definition, which the *Reginelli* Court concluded described individuals and groups disqualified from the evidentiary privilege, while it may

---

[15]     *Id.* at 305-06 (cleaned up; footnotes omitted). Although the *Reginelli* Court did not analyze separately the definition's third sentence, its reasoning appears to require that "reviewing the operation of hospitals, nursing homes, convalescent homes or other health care facilities" also cannot include reviewing the "quality and efficiency of services ordered or performed" by a professional health care provider. Because it allows for an "association" as well as a "committee," *i.e.*, a mere review *organization* which cannot perform peer review in the relevant sense, its proceedings would be discoverable.

not mention "peer review" as such, it also does not expressly describe the act of "credentialing." Yet the *Reginelli* Court strictly limited the scope of the "professional qualifications or activities" actually described by the statutory text, terms that are not so bound by their "common and approved usage,"[16] to credentialing. Thus, what the *Reginelli* Court called "plain" it in fact assumed—that "reviewing the professional qualifications or activities of its medical staff or applicants for admission thereto" did not, in the General Assembly's conception, entail peer review, or indeed *anything* but credentialing as narrowly defined in *Reginelli*. But the statute neither limits these two broad terms to a rote "credentialing" process nor does it suggest that credentialing cannot under any circumstances entail "reviewing . . . professional qualifications and activities of its medical staff or applicants." Moreover, as I highlighted in dissent, *Reginelli*'s characterization of whom or what that sentence describes depends upon the premise that the term "activities," also undefined, is constrained by, rather than supplemental to, professional qualifications *qua* credentials, and specifically that a health care provider's "professional . . . activities" cannot refer to "clinical services ordered or performed."[17] That

---

[16] 1 Pa.C.S. § 1903(a) ("Words and phrases shall be construed according to rules of grammar and according to their common and approved usage . . . .").

[17] In an effort to give separate meaning to "activities," the *Reginelli* Court offered that such activities "could include clinical research initiatives, continuing education, service on professional committees or organizations and, more broadly speaking, other qualifications deemed necessary by the hospital." *Reginelli*, 181 A.3d at 305 n.10. As I explained in dissent, "[n]o 'activity' is more tied to a health care provider's profession than the delivery of care." *See id.* at 314 (Wecht, J., dissenting). If "activities" has its broader, common meaning, the wording suggests merely that qualifications for a (re)applicant's admission encompass not only objective credentials but also the various metrics described in the definition of peer review—whether in furtherance of granting clinical privileges, as in this case, or otherwise. *See, e.g., active, activity,* Oxford English Dictionary 129-131 (2d ed. 1989) (offering definitions of the words activity and activities

premise finds no compelling support in the encompassing text of the definition, and it is at odds with common usages of the words in question.

In positing that some professional health care providers who are engaged in reviewing their peers' performance, alone or in concert, are not entitled to Section 425.4's privilege, and that individuals can never qualify at all, the *Reginelli* Court held that only review committees, not peer review itself, constitute the class protected by the evidentiary privilege. But the statute says no such thing. Further, evidence abounds that the General Assembly *intended* no such thing, including the PRPA's repeated allusion to "individuals" in both the definition of peer review itself as well as in the definition of professional health care provider, a term relevant in the PRPA *only* insofar as it adds substance to the definition of peer review itself. As noted, the title of the Act refers to individuals and groups, not committees.[18] Moreover, Section 425.4's full title, "Confidentiality of a review *organization*'s records," likewise makes no reference to committees.[19]

*Reginelli* explained none of this away. It did not even acknowledge the Act's title, nor did it reproduce the full title of Section 425.4 anywhere in its opinion. Its closest approach was a brief acknowledgement in a footnote that the title of Section 425.4

---

too lengthy and numerous to recite, none of which even hints at a limitation to the *Reginelli* Court's narrow account of credentialing).

[18]   "The title and preamble of a statute may be considered in the construction thereof. . . . The headings prefixed to titles, parts, articles, chapters, sections and other divisions of a statute shall not be considered to control but may be used to aid in the construction thereof." 1 Pa.C.S. § 1924.

[19]   *See* 63 P.S. § 425.4.

"contains a reference to 'review organizations,'"[20] but the *Reginelli* Court insisted that its analysis was bound by the statute's plain language. Consequently, the *Reginelli* Court adverted to the principle that statutory titles "shall not be considered to control," and "will have no effect when the statutory language is unambiguous and thus [is] not in need of construction."[21] This is true as far as it goes, but it goes nowhere unless the statutory language *is* unambiguous. The legacy of pre-*Reginelli* decisions that interpreted the Act differently,[22] as well as the division among the Justices in *Reginelli*, suggest otherwise.

---

[20] *Reginelli*, 181 A.3d at 305 n.12.

[21] *Id.*

[22] *See, e.g.*, *Troescher v. Grody*, 869 A.2d 1014 (Pa. Super. 2005) (applying the evidentiary privilege to credentialing documents). In an earlier case under the Act, the Superior Court found the Act ambiguous, and thus resorted, *inter alia*, to consideration of the Act's title and legislative history.

> Our task of ascertaining the intent of the legislature is hampered by the fact that minimal legislative history regarding the [PRPA] was recorded prior to its enactment in 1974. Furthermore, only one appellate decision has attempted to interpret the Act, and no cases have construed the exclusion provision which is at issue in the case at bar. However, we are not entirely without guideposts to aid us in our task. The words prefacing the Act provide evidence of a general legislative intent to preserve confidentiality: "[p]roviding for the increased use of peer review groups by giving protection to individuals and data who report to any review group." H.B. 1729, Act of July 20, 1974, P.L. 564, No. 193. "The purpose of the bill is to provide protection to those persons who give testimony to peer review organizations." Hearing on H.B. No. 1729, 158 Pa.Legis.J.—House at 4438 (1974) (Statement of Representative Wells). "Through these immunity and confidentiality provisions [§§ 425.3, 425.4] . . . the Legislature has sought to foster free and frank discussion by review organizations." *Steel v. Weisberg,* 500 A.2d 428, 430 (Pa. Super. 1985).

*Steel v. Weisberg*, 534 A.2d 814, 818 (Pa. Super. 1987) (citation modified).

Today's Majority is hoisted upon the same petard, even though it never quite cites or echoes *Reginelli*'s problematic contention that the language of the statute is plain and unambiguous. Like *Reginelli*, the Majority rejects the suggestion that the title of Section 425.4 is material to the analysis, implicitly depending upon *Reginelli*'s conclusion that the language of the statute unambiguously requires that we impose a critical distinction between review organizations and review committees, even if doing so risks leaving worthy peer reviewers without the protection necessary to ensure their candor.[23] The Majority also concedes that "the substantive text does not align with the title," and that, "[p]articularly as 'review committee' is not a defined term, Section [425.4's] use of this phrase gives rise to interpretive difficulties."[24] Yet rather than view this as evidence that *Reginelli*'s judicially-imposed distinction is unworkable, or at least at odds with legislative intent, the Majority falls back on the *Reginelli* Court's bald conclusions without subscribing to its reasoning, explaining that "it would be improper for this Court to resolve such difficulties by assuming the text was intended to apply to review organizations as a whole."[25]

Even more confusingly, the Majority cites the familiar principle that we may not rewrite a statute's text "under the guise of statutory construction."[26] But the only way this Court can preserve *Reginelli* is to write *out* of the statute the broad language of its titles

---

[23]     *See* Maj. Op. at 9 ("Although [Section 425.4's] title suggests it pertains to *review organizations*, the substantive text sets forth confidentiality mandates and testimonial privileges relating to the work and records of *review committees*.") (emphasis in original; footnote omitted).

[24]     *Id.* at 20 n.15.

[25]     *Id.*

[26]     *Id.* (citing *Burke v. Independence Blue Cross*, 103 A.3d 1267, 1274 (Pa. 2014)).

and definitions while maintaining that the language written *into* the Act by *Reginelli* somehow lurked in the shadows of the text the legislature actually gave us all along. On this account, the General Assembly meant nothing by its various uses of review group, review organization, and review committee because it evidently defined (albeit indirectly) review committee so as to strip the uses of review group and organization of any tangible meaning.

It is, of course, to be preferred when the legislature brings clarity to important questions of policy that lend themselves to a nuanced balancing of competing interests—here, between protecting the courts' desire to decide cases based with the benefit of all relevant evidence and ensuring that highly-trained health care professionals with specialized skills candidly police the effectiveness and integrity of their peers. But the PRPA's language simply is not plain, at least not as it pertains to the matter at hand, and I am hardly the first interlocutor to say so.[27] When divining a clear, unitary expression of intent in the text itself becomes aspirational and tortuous is when we must accept that the General Assembly simply failed to produce a statute that compels a particular, narrow reading. As regrettable as that may be, to stretch and supplement the text until it yields the illusion of clarity so as to avoid acknowledging that the statute just isn't clear enough to instill confidence in any one interpretation does no service to our overarching obligation to effectuate legislative intent with whatever tools we must employ to identify it.

---

[27] *Cf. Young v. W. Pa. Hosp.*, 722 A.2d 153, 156 (Pa. Super. 1998) ("Courts throughout this state have been cautious and wary in their interpretation of the language of the [PRPA], preferring to adopt a relatively strict interpretation . . . . The varied factual circumstances and the resulting almost contradictory case law interpreting the [PRPA] serves to further confuse the bar as to the proper interpretation and application of the statute.").

So the PRPA is ambiguous.[28]  Confronted with an ambiguous statute, we gain access to a panoply of interpretive tools designed for precisely that circumstance.  In particular, we presume that the legislature did not intend an absurd or unreasonable result—such as rendering it ineffectual relative to its clear purpose.[29]  Had the General Assembly intended the PRPA's liability and disclosure protections to apply according to *Reginelli*'s esoteric calculations, it could have drafted the statute more concisely to that effect.  And while it is true that we must interpret evidentiary privileges strictly, that time-honored principle is no warrant to artificially straiten a privilege that the General Assembly made expansive by design to achieve a particular aim.

The indisputable object of the PRPA is to ensure that no personal or professional risks to professional health care providers who contribute to the peer review process be allowed to deter them from doing so.  The inextricably intertwined mechanisms that the legislature deemed essential to this task were confidentiality *and* a liability shield.  It is exceedingly difficult to imagine how the omission of either is consistent with the General Assembly's objective.  The *Reginelli* Court responded that we can give effect to a definition of review organization that fully encompasses, but is broader than, the inferred definition of review committee.  To that end, the Court concluded that those review

---

[28]  *See Grimes v. Enter. Leasing Co. of Phila.*, 105 A.3d 1188, 1193 (Pa. 2014) ("Statutory text is ambiguous if it is susceptible to two or more reasonable interpretations.").

[29]  *See Bowling v. Office of Open Records*, 75 A.3d 453, 466 (Pa. 2013) ("When [the] words of a statute are . . . ambiguous, a reviewing court looks to other principles of statutory construction, among them: the occasion and necessity for the statute; the circumstances under which the statute was enacted; the mischief to be remedied; the object to be attained; [and] the consequences of a particular interpretation.").

organizations that do not qualify as review committees shielded by the evidentiary privilege nonetheless are entitled to the liability protections identified in Section 425.3, which, unlike the evidentiary privilege, speaks primarily in terms of "organizations" rather than committees.[30]  But it is inconsistent with the Act's design to assure reporting professionals that they won't be liable for what they report, when the risk remains that they will be called to account, and their identities revealed, in open court, with the attendant risk of adverse professional consequences.[31]  The result isn't a belt without suspenders.  It's a hat with no shoes.

Taking a step forward, today's Majority shifts the lower courts' focus away from the grammatical exercise of *Reginelli* in favor of a functional focus upon peer review itself, turning attention away from the *who* and toward the *what* that the General Assembly endeavored to protect.  But *Reginelli* resists this change of perspective.  Unequivocally, the *Reginelli* Court held that "[r]eview of a physician's credentials for purposes of membership (or continued membership) on a hospital's medical staff *is markedly different*

---

[30]     That Section 425.3's liability protections are stated in terms of individuals can best be understood as a function of the fact that unincorporated review organizations, as such, would not appear to be at risk of direct legal consequence.  Thus, the only concern with such groups relevant to ensuring effective peer review involves disclosure of records in their possession.  And since it is not at all clear how such groups—again, as such—might suffer adverse professional consequences from their activities (since they are probably not looking for jobs), the evidentiary privilege that protects their records can only meaningfully protect individuals.  To deny either is to leave the reporting professionals critically exposed, thereby eroding the effectiveness of peer review in general.

[31]     It also raises a separate question as to why the General Assembly would concern itself with the risk of civil liability to an applicant if the only work of the "organization" in question was its assessment of whether an applicant's account of his own education, board certifications, and the like was true.  What are the odds that an applicant denied admission or privileges for a misrepresentation on one of these matters would have any practical basis to sue over the denial?

*from* reviewing the 'quality and efficiency of services ordered or performed by a physician when treating patients.'[32]  And with that, it effectively closed the door to recognizing *privileging* as a task intertwined with credentialing that evades *Reginelli*'s unqualified exclusion of credentialing from the Act's evidentiary privilege.

If that were not enough to confirm *Reginelli*'s irreconcilability with today's decision, further evidence is found in *Reginelli*'s express disapproval of the Superior Court's decision in *Dodson v. DeLeo*.[33]  In *Dodson*, the sole passage that could have invited the *Reginelli* Court's disapproval was that in which the court held—for at least the second time, and precisely as we do in this case—that "[d]ocuments used in the determination of staff privileges are exactly the type of documents the legislature contemplated when drafting the Peer Review Protection Act.  Granting, limiting, or revoking staff privileges is one of the strongest tools the medical profession uses to police itself."[34]  Since only that passage can be read as having anything to do with "credentialing" as *Reginelli* conceived it, that means the Court found no material distinction between privileging and credentialing under Section 425.4.  To stand with *Reginelli*'s disapproval of *Dodson*, then, is to stand against the Majority's analysis in this case, which shares *Dodson*'s salutary view of privileging, peer review, and the importance of the evidentiary privilege to both.

In recalibrating the relevant inquiry, today's Majority at least cracks the door that *Reginelli* slammed shut, and that reflects an improvement upon the *status quo*.  But having taken those two steps forward, the Court takes one step back when it insists that

---

[32]  *Reginelli*, 181 A.3d at 305 (emphasis added).

[33]  872 A.2d 1237 (Pa. Super. 2005); *see Reginelli*, 181 A.3d at 306 n.13.

[34]  *Dodson*, 872 A.2d at 1242 (quoting *Young*, 722 A.2d at 156).

it can reshape how courts approach the PRPA in this fashion while honoring *Reginelli*'s clearly incompatible approach. This only ensures that the confusion and discomfort with *Reginelli*'s prescriptive approach that the lower courts have expressed in the years since the Court issued the decision[35] will persist.

---

[35] *See, e.g.*, *Leadbitter*, 229 A.3d 292, 297 (Pa. Super. 2020) ("Although the professional evaluations of Dr. Petraglia reviewed by the credentialing committee are different from the type of documents that the Supreme Court considered [to be credentialing documents] in *Reginelli*, the Supreme Court's analysis still requires us to focus on the type of organization that is reviewing the professional evaluations, not whether the documents meet the definition of peer review documents."); *Estate of Krappa v. Lyons*, 211 A.3d 869 (Pa. Super. 2019), *appeal denied*, 222 A.3d 372 (Pa. 2019) (*per curiam*). Although I joined the Court's denial of review in *Krappa*, I wrote separately to observe that a more suitable case challenging the bright-line approach the *Reginelli* Court relied upon was sure to arise, because the difference between what the Majority characterized as credentialing and what the Act defines as peer review "will prove more difficult to discern in practice than it is to describe in the pages of a judicial opinion." *Krappa*, 222 A.3d at 374 (Wecht, J., concurring). Here we are.